# COURT OF ERRORS AND APPEALS,

## JANUARY TERM,

## 1890.

———•———

## FRIESZLEBEN *v.* SHALLCROSS *et al.*

*Statutes, Construction of— Constitutionality of—Delinquent Poll Taxables—Dropping of from Assessment List.*

The Constitution of Delaware provides that every elector must have paid a county tax within two years next before the election, which shall have been assessed at least six months before the election.

The act of Delaware, passed April 10, 1873, provides that when persons assessed and liable to pay poll tax only fails to pay the same to the collector of county taxes, the said collector returning the same as uncollected and making proof to the levy court of his having complied with the requirements ot the law as to public notice of times and places where he would receive taxes as required by law, and having attended thereupon, the said taxes shall be allowed to the collector as delinquencies and the names of such delinquents shall be dropped from the assessment list by the levy court and shall not be placed thereon again for a period of one year from and after the date of such allowance.

Said law cannot operate to deprive an elector of his right to vote without his co-operation or consent. He who will not contribute his part to support the government that protects him ought not to be allowed, by the use of the ballot, to neutralize the vote of another, who does. And he who will not give himself the trouble to see that he is assessed sleeps upon his rights.

The said legislation of 1873 does not act to disfranchise a voter in spite of himself by preventing him from paying his taxes, and never even temporarily, except as a consequence of his own neglect, and therefore cannot be held to be unconstitutional.

The acts of 1873 were enacted by the legistature in the legitimate exercise of its tax-
ing power, and were appropriate and necessary to the due execution thereof;
and were in their primary purpose and design, a regulation of the assessment
and collection of county taxes, and but incidentally and seccndarily a regula-
tion for the qualification of electors.

The General Assembly, according to the true meaning and intent of the Constitution
of this State, has authority to exclude from the assessment, in any particular
year, a citizen who has been ascertained, by a mode appropriate and essential
to the effectual exercise of the taxing power, to be, in the legislative judgment,
an unproductive taxable for that year, and said power is paramount to any
alleged right of the unproductive citizen to be assessed.

(*January 29, 1890.*)

CASE stated reserved from Superior Court, New Castle county.

In February, 1885, the name of the plaintiff was, on a gen-
eral assessment, duly placed upon the assessment list for the Sixth
ward of the city of Wilmington; and the levy court of New
Castle county afterwards, in the spring of the same year, duly laid
a poll-tax upon him.   On the 2d day of March, 1886, the plain-
tiff, who had not paid said poll-tax, was returned by the collector
of county taxes for the collection district, including the Sixth ward
of said city, to said levy court, as a delinquent; and thereafter, on
the 24th day of March, in the same year, the defendants, com-
posing and sitting as said levy court, allowed said poll-tax as de-
linquent, and caused the name of the plaintiff to be struck and
dropped from the assessment list; whereby no tax was assessed or
laid upon the plaintiff for the year 1886, and he was consequently
deprived of all opportunity at any time to pay a county tax for
that year, and thereby qualify himself to vote at the general elec-
tion in November of that year, although, in all respects save the
payment of a county tax, qualified as an elector.   The levy court
had no evidence that the plaintiff was dead, or had left the state,
or the Sixth ward of said city, or said collection district.   The
only evidence before said court was the collector's return of the
plaintiff "as delinquent."   The action of the defendants in causing

the name of the plaintiff to be struck and dropped from the assessment·list, and continuing to leave it off the same, was in strict accordance with the provisions of section 1 of the act entitled "An act in relation to the collection of taxes in this state," passed at Dover, April 10, 1873, and the provisions of section 9 of the act entitled "An act in relation to the duties of assessors, and of the levy courts, in the several counties of the state," passed at Dover, April 9, 1873. Section 1 of the act of April 10, 1873, provides that, in the case of persons assessed and liable to pay poll-taxes, upon the return of the collector in form and verified as therein provided, it shall be the duty of the levy court " to allow said collector, as delinquencies, the taxes uncollected by him, and the names of such delinquents shall be dropped from the assessment list by the levy court, and shall not be placed thereon again for a period of twelve months from and after the date of such allowance." Section 9 of the act of April 9, 1873, (Rev. Code, 1874, p. 84,) provides " that it shall not be lawful for any assessor or any levy court, upon the personal application of any one, or otherwise, to place upon the assessment in any hundred the name of any person who, having failed to pay the county tax assessed against him or her for the preceding year, was returned and allowed as a delinquent, until after the expiration of the twelve months from the time such allowance as delinquent was made by the levy court." The defendants reply upon the foregoing provisions for the justification of their action in causing the name of the plaintiff to be struck and dropped from the assessment list, and continuing to leave it off the same. The plaintiff had not paid any county tax within the space of two years next preceding the general election in 1886. This suit is an action on the case, brought for the recovery of damages resulting to the plaintiff by reason of his having been deprived by the defendants of all opportunity of paying a county tax for 1886, and thereby qualifying himself to vote at said general election. The questions reserved for the decision of the court of errors and appeals are : *First*, whether or not the above provisions

of the legislature of 1873 are unconstitutional and void; and, *secondly*, if said provisions be unconstitutional and void, whether or not the defendants are personally liable in damages for their action in the premises.

*Edward G. Bradford, Levi C. Bird,* and *Anthony Higgins,* for plaintiff:

If the provisions under which the defendants seek to justify their action are unconstitutional, this court should not hesitate to declare their invalidity.

In *Bailey v. Railroad Co.,* 4 Harr. 389, 402, 403, Harrington, J., delivering the opinion of the Court of Errors and Appeals, says:

"The judiciary derives existence and power from the same high source (the constitution.) Its business is to administer justice according to *law;* that is, according to the constitutions of the Government, and the laws passed by the Legislature within the sphere of its authority, and in conformity to the constitution. None other are laws of the land; having any force or effect. In a case, therefore, of plain, palpable conflict between the constitution and an act of assembly, the Court cannot do otherwise than distinguish between that which is law, and that which is not. And, in doing so, so far from arrogating any right to control the Legislature in any of its constitutional powers, it is but asserting that which forms the basis of all our institutions, the supremacy of the constitution itself, and the entire dependance of every department upon the ultimate sovereignty of the people."

The purpose of the provisions of the legislation of 1873 upon which the defendants rely was either to regulate the assessment and payment of county taxes, or to regulate the elective franchise or its exercise, or, possibly, the attainment of both these ends.

Upon the assumption that the purpose of those provisions was the regulation of the assessment and payment of county taxes, can they be sustained as constituting a fiscal regulation of the State, incidentally affecting the elective franchise, or its exercise?

Can those provisions be sustained as a regulation of the elective franchise or its exercise?

The provisions of the legislation of 1873 upon which the defendants rely, considered as a fiscal regulation of the State, are unconstitutional and void, as violative of the Constitution of Delaware.

The Constitution of Delaware no where imposes any restriction upon the exercise of the sovereign right of taxation, but leaves the legislature clothed with full power to provide for the apportionment, assessment and collection of taxes.

The power of taxation necessarily inheres in every sovereign state as the necessary means of self-perpetuation.

All constitutional guaranties of private rights are to be read in the light of this principle.

But taxation is one thing; confiscation or extortion is another thing.

The former is constitutional; the latter is unconstitutional; and whether in a given case the legislature is undertaking to provide for taxation, on the one hand, or, on the other, for confiscation or extortion, depends upon the essential nature of taxation.

Section 7 of Article 1 of the Constitution of Delaware provides by necessary implication, though not in express terms, that no person shall be " deprived of life, liberty or property, unless by the judgment of his peers or the law of the land."

*Cooley's Const. Lim.*, 351; *Ervine's Appeal*, 16 Pa. St., 256; *Banning v. Taylor*, 24 Id., 289.

The phrase " law of the land" is equivalent to the words " due process of law," and does not mean a statute working the wrong complained of.

*Taylor v. Porter*, 4 Hill, 140; *Cooley's Const. Lim.*, 353, 354; *Brown v. Hummel*, 6 Pa. St., 86.

Any attempt under the guise of taxation at confiscation or extortion is forbidden by the above constitutional provision.

Cooley says: " In an exercise of the power to tax, the purpose always is, that a common burden shall be sustained by common contributions, regulated by some fixed general rule, and appor-

tioned by the law according to some uniform ratio of equality. While therefore the power is great and imperative, it is not arbitrary; it rests upon fixed principles of justice, which have for their object the protection of the tax payer against exceptional and invidious exactions, and it is to have effect through established rules, operating impartially."

*Cooley on taxation*, p. 2.

And again : " Vast as is the power of the government to levy taxes upon its citizens, there are nevertheless limitations upon it of a very distinct and positive character, which inhere in the very nature of the power itself. Some of these limitations are commonly declared in the written constitutions, but the declaration is rather from abundant caution than from necessity, as the limitations are equally imperative whether thus declared or not." *Id.* p. 41.

It is not in the power of the legislature, under the guise of taxation, to give the property of A to B, or to impose the whole burden of a tax for the State upon one person or upon one county. Such absolute, arbitrary powers have no place in a government regulated by law. *Burroughs on Taxation*, Sec. 26.

" To compel individuals to contribute money or property for the public use without reference to any common ratio, and without requiring the sum paid by one piece of property, or by one person to bear any relation whatever to that paid by another, would be a forced contribution, not a tax, within the sense of that term as applied to the exercise of powers by an enlightened government." *Id.* Sec. 51.

" Everything that may be done under the name of taxation is not necessarily a tax ; and it may happen that an oppressive burden imposed by the government, when it comes to be carefully scrutinized, will prove, instead of a tax, to be an unlawful confiscation of property, unwarranted by any principle of constitutional government." *Cooley's Const. Lim.*, 487.

" It is of the very essence of taxation that it be levied with

equality and uniformity, and to this end, that there should be some system of apportionment.

Where the burden is common, there should be common contribution to discharge it. Taxation is the equivalent for the protection which the government affords to the persons and property of its citizens ; and as all are alike protected, so all alike should bear the burden, in proportion to the interests secured  *  *  *  * In this particular the State constitutions have been very specific though in providing for equality and uniformity they have done little more than state in precise language a principle of constitutional law which, whether declared or not, would inhere in the power to tax." *Id.* 495.

" Whatever may be the basis of the taxation, the requirement that it should be uniform is universal." *Id.* 499.

He states as one of the essentials of uniformity in taxation that " the apportionment of taxes should reach all the objects of taxation within the district." *Id.* 501.

In *Sharpless v. Mayor of Philadelphia,* 21 Pa. St., 147, 168, Black, C. J., delivering the opinion of the Court, says :

" But I do not mean to assert that every act which the Legislature may choose to call a tax law is constitutional. The whole of a public burden cannot be thrown on a single individual, under pretence of taxing him, nor can one county be taxed to pay the debts of another, nor one portion of the State to pay the debts of the whole State. These things are not excepted from the powers of the Legislature, because they did not pass to the assembly by the general grant of legislative power. A prohibition was not necessary. An Act of Assembly commanding or authorizing them to be done, would not be a law, but an attempt to pronounce a judicial sentence, order or decree."

In *Hammett v. Philadelphia,* 65 Pa. St., 146, an act authorizing the city of Philadelphia to assess the cost of maintaining Broad street upon the owners of property abutting thereon was declared unconstitutional.

In *Washington avenue*, 69 Pa. St., 352, an act laying an assessment for the construction of a road mainly through agricultural land upon property holders in the vicinity was held unconstitutional, as being a local assessment for general benefit.

Agnew, J., delivering the opinion of the Court says, pp. 363, 364:

" I admit that the power to tax is unbounded by any express limit in the Constitution—that it may be exercised to the full extent of the public exigency. I concede that it differs from the power of eminent domain, and has no thought of compensation by way of return for that which it takes and applies to the public good, further than all derive benefit from the purpose to which it is applied.

But nevertheless taxation is bounded in its exercise by its own nature, essential characteristics and purpose. It must therefore visit all alike in a reasonable practicable way of which the legislature may judge, but within the just limits of what is taxation. Like the rain it may fall upon the people in districts and by turns, but still it must be public in its purpose, and reasonably just and equal in its distribution, and cannot sacrifice individual right by a palpably unjust exaction. To do so is confiscation, not taxation, extortion, not assessment, and falls within the clearly implied restriction in the Bill of Rights * * Laws which cast the burden of the public on a few individuals no matter what the pretence or how seeming their analogy to constitutional enactments, are in their essence despotic and tyrannical, and it becomes the judiciary to stand firmly by the fundamental laws, in defence of those general, great and essential principles of liberty and free government, for the establishment and perpetuation of which the Constitution itself was ordained."

Cooley says with respect to poll taxes : " These are not a common resort in modern times, and only in a few cases could they be either just or politic. As they regard only the person, they must be shared equally by all, except under governments where privileged

orders are recognized and where they might be graded according to the orders to which the several persons taxed belong." *Cooley on Taxation*, p. 18.

He quotes with unqualified approval the following language from the opinion of the Court in *City of Lexington v. McQuillan*, 9 Dana., 513.

" An exact equalization of the burdens of taxation is unattainable and utopian. But still there are well defined limits within which the practical equality of the Constitution may be observed, and which, therefore, should be deemed impassable barriers to legislative power. Taxation may not be universal, but it must be general and uniform. Hence, if a capitation tax be laid, none of the class of persons thus taxed can be constitutionally exempt upon any other ground than that of public service * * * Although there may be a discrimination in the subjects of taxation, still persons in the same class, and property of the same kind, must generally be subjected alike to the same common burden." *Id.* 178, 179.

*State v. Township Committee of Readington*, 36 N. J. L., 66.

Until the enactment of the legislation of 1873 our system of county taxation was in perfect accord with the foregoing principles.

That system was intended and calculated to secure the assessment each year of every individual belonging to any and every class of taxables.

And it was further intended and calculated to effect equal and just taxation of all persons assessable under the law; it being the duty of the Levy Court to " apportion and lay such taxes to and upon the assessment aforesaid * * at and according to a certain rate for each of said taxes upon every hundred dollars of the said assessments, and so *pro rata*."

But with the enactment of the legislation of 1873, a new order of things was instituted in gross disregard and violation of the fundamental principles of taxation.

Arbitrary and oppressive exaction has taken the place of equal and just taxation.

It is true that the legislature has large discretion in classifying the persons or subjects liable to taxation.

But the legislature has attempted to go beyond any legitimate or constitutional classsification and arbitrarily to discriminate, in the assesment and collection of taxes, between persons belonging to the *same class.*

It practically confers each year immunity from taxation upon thousands of poll taxables, and imposes in whole or in part the burden they shoud bear upon the remaining poll taxables.

The poll taxables, in contradistinction to the property taxables, are a class by themselves, one and indivisable.

That class consists of all freemen above the age of twenty-one years, who are not property owners.

Yet the legislature has undertaken to separate this single and indivisable class of taxables into two groups, viz.:

1. Those who, in the preceding year, did not pay their poll tax.

2. Those who, in the preceding year, paid their poll tax.

And upon this arbitrary sub-classification the legislature has undertaken to clothe the first group with immunity from taxation for the succeeding year, and impose, in whole or in part, the burden they should bear upon the second group.

In the light of the foregoing principles, it is submitted that this attempt is unconstitutional.

Human ingenuity will in vain be tortured to discover any legitimate reason or justification for this sub-classification.

Can it be assumed that the legislature intended by this course to force or induce the payment of poll taxes?

How can promised immunity from taxation serve as a spur or inducement for payment of taxes?

Possibly it may be suggested that the consideration that, if the poll taxable does not pay his tax in one year, he may be dropped from the assessment list and consequently not have an opportunity

to qualify himself to vote by the payment of a tax in the succeeding year, may induce him to pay his tax in the first year.

But this is virtually to disfranchise him for the mere non-payment of a poll tax in the first year, and is clearly forbidden by the Constitution.

For, as will be more fully shown hereafter, when the Constitution provides that " the legislature may impose the forfeiture of the right of suffrage as a punishment for crime," it declares in effect that such right shall not be forfeited for any offence or delinquency short of crime.

The legislature, under the Constitution, could no more authorize the sub-classification in question than it could validly have provided that all poll taxables who had not attended divine worship a certain number of times during the preceding year, or who were not of high moral character, or who were cross-eyed or turned their toes inward while walking, should enjoy immunity from taxation.

The guaranties of the Constitution require that the same rule of taxation shall be applied to all persons who are in the same position with respect to the payment of the tax to be levied.

Therefore, if the tax be upon persons *as persons,* all the individuals comprised in the class of persons designated as poll taxables must bear their share of the common burden.

For logically and necessarily each of them is in the same position with respect to the payment of such tax.

Nor can it be of any moment that delinquent poll taxables enjoy such immunity for only one year, or two years, as the case may be.

Whether they be relieved temporarily or permanently from taxation, the principle is the same; the difference is merely one of degree.

And relieving thousands of poll taxables from the payment of tax and imposing the burden they should bear in whole or in part upon the remaining poll taxables is the same in principle as

placing the whole burden upon one or more designated individuals of the class.

The difference between the two cases is altogether one of degree.

The legislation of 1873, considered as a regulation of taxation, therefore clearly violates the Constitution of Delaware.

The provisions of the legislation of 1873 upon which the defendants rely, considered as a fiscal regulation of the state, are unconstitutional and void, as violative of the Constitution of the United States.

The fourteenth amendment to the Constitution of the United States declares :

" Nor shall any State deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." ,

The prohibitions of the amendment are addressed to State agencies.  In *Ex-parte Virginia*, 100 U. S., 339, 347, the Court say :

" A State acts by its legislative, its executive or its judicial authorities.  It can act in no other way.  The constitutional provision, therefore, must mean that no agency of the State, or of the officers or agents by whom its powers are exerted, shall deny to any person within its jurisdiction the equal protection of the laws.

Whoever, by virtue of public position under a State government, deprives another of property, life or liberty, without due process of law, or denies or takes away the equal protection of the laws, violates the constitutional inhibition."

It follows that an act of the legislature undertaking to require or authorize the denial by the officers or agents of the State of such equal protection is forbidden by the amendment.

By it the equal protection of the laws is extended to all persons within the jurisdiction of the State, and secures them against unjust and unequal exactions of all kinds.

In *Minneapolis Railway Co. v. Beckwith*, 129 U. S. 26, 28, the Court say :

" That clause does undoubtedly prohibit discriminating and partial legislation by any State in favor of particular persons as against others in like condition.

Equality of protection implies not merely equal accessibility to the Courts for the prevention or redress of wrongs and the enforcement of rights, but equal exemption with others in like condition from charges and liabilities of every kind."

In the case of *In re Ah Fong*, 3 Sawyer, 144, 157, the Court speaking of the fourteenth amendment say :

" The great fundamental rights of all citizens are thus secured against any state deprivation, and all persons, whether native or foreign, high or low, are, whilst within the jurisdiction of the United States, entitled to the equal protection of the laws.   Discriminating and partial legislation, favoring particular persons, or against particular persons of the same class, is now prohibited. Equality of privilege is the constitutional right of all citizens, and equality of protection is the constitutional right of all persons.   An equality of protection implies not only equal accessibility to the Courts for the prevention or redress of wrongs, and the enforcement of rights, but equal exemption with others of the same class from all charges and burdens of every kind." *Barbier v. Connolly*, 113 U. S., 27, 31.

But the guaranty of the equal protection of the laws would be largely nugatory if the State were at liberty to enact unequal laws applying to persons of the same class or in the same position.

The broad purpose of the amendment in such case could in most instances readily be defeated by hostile legislation in indirect form.

The pledge of equal protection of the laws is therefore the pledge of the protection of equal laws.

In *Yick Wo v. Hopkins*, 118 U. S., 356, 369, the Court say of the fourteenth amendment :

"It says: "Nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.' These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any difference of race, of color or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws."

In *County of San Mateo v. Southern Pacific Railroad Company*, 8 Sawyer, 238, it was held that certain provisions of the Constitution and laws of California relating to taxation were forbidden by the fourteenth amendment and were unconstitutional and void. Field, J., delivering the opinion of the Court says, p. 251.

"Whatever the State may do, it cannot deprive any one within its jurisdiction of the equal protection of the laws. And by equal protection of the laws is meant equal security under them to every one, on similar terms, in his life, his liberty, his property, and in the pursuit of happiness.

It not only implies the right of each to resort, on the same terms with others, to the courts of the country for the security of his person and property, the prevention and redress of wrongs, and the enforcement of contracts, but also his exemption from any greater burdens or charges than such as are equally imposed upon all others under like circumstances. Unequal exactions in every form, or under any pretence, are absolutely forbidden, and of course unequal taxation, for it is in that form that oppressive burdens are usually laid. It is not possible to conceive of equal protection under any system of laws where arbitrary and unequal taxation is permissible; where different persons may be taxed on their property of the same kind, similarly situated, at different rates; where, for instance, one may be taxed at one per cent. on the value of his property, another at two or five per cent., or where one may be thus taxed according to his color, because he is white, or black, or brown, or yellow, or according to any other rule than that of a fixed rate proportionate to the value of his property * * What is called

for under a constitutional provision requiring equality and uniformity in the taxation of property must be equally called for by the Fourteenth Amendment. The forced contribution from one which would follow taxation of his property without reference to a common ratio would be inconsistent with that equal protection which the amendment requires the State to extend to every person within its jurisdiction."

Again, speaking of the Fourteenth Amendment, the Court say, p. 261 :

" It does require that in all such legislation, hostile and partial discrimination against any class or person shall be avoided; that the States shall impose no greater burdens upon any one than upon others of the community under like circumstances, nor deprive any one of rights, which others similarly situated are allowed to enjoy. It forbids the State to lay its hand more heavily upon one than upon another under like conditions. It stands in the Constitution as a perpetual shield against all unequal and partial legislation by the States, and the injustice which follows from it, whether directed against the most humble, or the most powerful, against the despised laborer from China, or the envied master of millions."

*County of Santa Clara v. Southern Pacific Railroad Company*, 9 Sawyer, 165, was a case similar to the last.

Further citation of authority or argument is not required to show that the legislation of 1873 is in conflict with the broad policy of the fourteenth amendment.

It is therefore submitted that considered as an attempt to regulate taxation, such legislation is forbidden by the Constitution of the United States.

The provisions of the legislation of 1873, upon which the defendants rely, considered as a regulation of county taxation, are unconstitutional and void under both the Constitution of Delaware and the constitution of the United States, by reason of the power conferred upon collectors of county taxes to discriminate arbitrarily

and oppressively as between delinquent poll taxables with respect to their liability to pay tax for the succeeding year.

While the legislation of 1873 provides that delinquent poll taxables who are duly returned by the collector to the Levy Court as having failed to pay their poll tax shall be dropped from and remain off the assessment list for at least a year, it nowhere requires the collector to so return all delinquents, but confers upon him unrestrained power of choice as to whom he will return as delinquent.

Thus the collector is clothed with authority, at his mere whim, or from favor, malice or party zeal, without check or hindrance to decide, without appeal from his decision, what delinquent poll taxables shall, and what delinquent poll taxables shall not, pay tax for the ensuing year.

His mere *ipse dixit* is a final determination whether or not thousands of delinquent poll taxables shall, on account of their delinquency, enjoy immunity from taxation for that period, to the detriment of other taxables.

He, under the legislation of 1873, arbitrarily decides whether great masses of the voting population of the State, in whom practically rests the whole sovereignty of the people, shall, or shall not, have the opportunity to pay tax and thereby qualify themselves to exercise the most fundamental political right of American citizens.

Any legislation which carries in it such arbitrary power of unequal and oppressive administration as to destroy the equality of rights guaranteed by the Constitution is forbidden by that instrument.

In *Yick Wo v. Hopkins*, 118 U. S., 356, 373, the Court say: " In the present cases we are not obliged to reason from the probable to the actual, and pass upon the validity of the ordinances complained of, as tried merely by the opportunities which their terms afford, of unequal and unjust discrimination in their administration. For the cases present the ordinances in actual operation, and the facts shown establish an administration directed so exclusively

against a particular class of persons as to warrant and require the conclusion, that, whatever may have been the intent of the ordinances as adopted, they are applied by the public authorities charged with their administration, and thus representing the State itself, with a mind so unequal and oppressive as to amount to a practical denial by the State of that equal protection of the laws which is secured to the petitioners, as to all other persons, by the broad and benighn provisions of the Fourteenth Amendment to the Constitution of the United States. Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution."

But here the law is not "fair on its face" or "impartial in appearance."

It does not either forbid or command the return by the collector to the Levy Court of any or all poll taxables, who have failed to pay their tax, as delinquent.

It assumes, as is manifest from the nature of its provisions, that the collector will return some as delinquent, but contemplates and intends that the collector shall not return all as delinquent.

Otherwise, the law would have required all poll taxables who failed to pay their tax to be returned as delinquent.

The law thus was enacted clearly with the expectation or intention that it should be so administered as to destroy constitutional equality of rights, and is therefore unconstitutional and void.

The primary purpose of the provisions of the legislation of 1873 upon which the defendants rely, was not the regulation of taxation, but the regulation of the elective franchise or its exercise.

If the legislature had provided that the delinquent poll taxable should in the succeeding year pay not only the tax properly falling upon him for that year, but also the amount which he

2

should have paid theretofore, in relief of tax payers not at fault, such a provision, however unsound in principle, might be considered as having been intended as a proper regulation of taxation.

But to reward delinquency by exemption from taxation, and to punish those not at fault by loading them with the burden which should rest upon others, is a course so foreign to all principles relating to taxation as inevitably to produce the conviction that the primary purpose of the legislature was not the regulation of taxation.

The rule that an individual is presumed to intend the natural consequences of his acts equally applies to the case of a legislature.

In *Henderson et al. v. Mayor of N. Y. et al.,* 92 U. S., 258, 268, the Court say:

" In whatever language a statute may be framed, its purpose must be determined by its natural and reasonable effect."

In *Soon Hing v. Crowley,* 113 U. S. 703, 710, the Court say:

" The motives of the legislators considered as the purpose they had in view will always be presumed to be to accomplish that which follows as the natural and reasonable effect of their enactments."

The provisions of the legislation of 1873, upon which the defendants rely, considered as a regulation of the elective franchise or its exercise, are unconstitutional and void, as violative of the Constitution of Delaware.

The primary function of written constitutions is rather the recognition and regulation of pre-existing rights fundamental in their nature, and their protection against assault or encroachment on the part of the State, than the creation of new rights.

Cooley says:

" In considering State constitutions we must not commit the mistake of supposing that, because individual rights are guarded and protected by them, they must also be considered as owing their orign to them.   These instruments measure the powers of the rulers, but they do not measure the rights of the governed.   ' What

is a constitution, and what are its objects ? It is easier to tell what it is not than what it is. It is not the beginning of a community, nor the origin of private rights ; it is not the fountain of law, nor the incipient state of government; it is not the cause, but consequence, of personal and political freedom ; it grants no rights to the people, but is the creature of their power, the instrument of their convenience. Designed for their protection in the enjoyment of the rights and powers which they possessed before the constitution was made, it is but the frame work of the political government, and necessarily based upon the pre-existing condition of laws, rights, habits, and modes of thought. There is nothing primitive in it : it is all derived from a known source. It presupposes an organized society, law, order, property, personal freedom, love of political liberty, and enough of cultivated intelligence to know how to guard it against the encroachments of tyranny. A written constitution is in every instance a limitation upon the powers of government in the hands of agents ; for there never was a written republican constitution which delegated to functionaries all the latent powers which lie dormant in every nation, and are boundless in extent; and incapable of definition." *Cooley on Const. Lim.*, 36.

In the United States the doctrine is firmly rooted that there are vested in the people certain inherent and inalienable rights essential to the welfare and happiness of mankind.

*Butcher's Union Co. v. Crescent City Co.*, 111 U. S. 746, 756.

The doctrine of the innate dignity and sovereignty of manhood thus underlying our distinctive American liberty gives color, and breadth and grandeur to our political institutions.

It imperatively demands an equality of civil rights among all men.

The individual as a member of the State, having equal essential worth and dignity with all others is therefore entitled to equality with all others in those fundamuntal rights of person, of property

and of occupation, the security of which is the chief aim of civilized government. *1 Webster's Works*, 77.

The Declaration of Rights in this State in 1776 proclaimed that " all government of right orignates from the people ;" that " the people of this state have the sole, exclusive and inherent right of governing and regulating the internal police of the same ; and that " the right in the people to participate in the legislature is the foundation of liberty and of all free government." *1 Del. Laws*, App. 79.

Our Bill of Rights declares:

" Through divine goodness, all men have by nature the right of worshipping and serving their creator according to the dictates of their consciences, of enjoying and defending life and liberty, of acquiring and protecting reputation and property, and in general of attaining objects suitable to their condition, without injury by one to anothr ; and as these rights are essential to their welfare, for the due exercise thereof, power is inherent in them ; and therefore all just authority in the institution of political society is derived from the people, and established with their consent, to advance their happiness.

The same provisions are found in the Constitution of the State adopted in 1792. *1 Del. Laws XXVIII.*

Section 4 of Article IV of the Constitution of the United States provides that " the United States shall guarantee to every State in this Union a republican form of government."

The sovereignty of the people and their inherent right of self-government must be accepted as an undeniable truth.

But the ballot is the only means by which the people can exercise their inherent sovereignty and enjoy the right of self-government.

In *Auld v. Walton*, 12 La. Am., 129, 139, the Court say :

" The sovereign, in this land, is the people, and the ballot is the expression of the sovereign will."

The right to vote is thus the corner stone upon which rest our free institutions and the preservation of our rights and liberties.

This right, strictly considered, is not a natural right; for it has its origin in organized society, without which it could not exist.

Where the right exists, it is, however, a supreme and fundamental right vested in the citizen, as sharing in the sovereignty of the people.

In *Yick Wo v. Hopkins*, 118 U. S., 356, 370, the Court say:

"Though not regarded strictly as a natural right, but as a privilege merely conceded by society according to its will, under certain conditions, nevertheless it is regarded as a fundamental political right, because preservative of all rights."

In *Brown v Hummel*, 6 Pa. St., 86, 93, the Court say:

"The most important of all our franchises—the right of an elector and citizen—cannot, in a confined sense, be called property. It is not assets to pay debts, nor does it descend to the heir or administrator.   But who does not feel its value; and who but would turn pale if he thought he could be deprived of it without hearing or trial, by an Act of Assembly?"

But the right to vote is not, and in the nature of things, cannot be be universal.

By the common judgment of all communities enjoying the right of self-government certain classes of individuals are regarded as disqualified or as lacking the qualifications for the exercise of the elective franchise and are excluded therefrom.

Such exclusion results from actual or presumed inability to properly exercise the right to vote or other considerations of social economy.

Thus infants and criminals are excluded from considerations of inability or unfitness; and women by reason of social policy and their liability to undue influence.

But whenever in the United States certain classes of citizens are excluded by the fundamental law of a State from the enjoyment of the elective franchise, the exclusion grows out of and is based

upon their actual or presumed unfitness to properly exercise the sovereign power of self-government.

Those who are not so excluded have vested in them practically the whole sovereign power of the State, to be exercised through the instrumentality of the ballot.

And the power thus vested in them is a high and sacred trust; for its exercise vitally concerns the life, liberty and property not only of those who wield it but of all the other classes in the State.

Therefore, it is of the utmost importance that the organic law, while excluding those who are deemed incapable of properly exercising the elective franchise, should clearly point out the class of citizens who are the depositaries of the sovereignty of the State.

Very high authority has declared that " the definition of the right of suffrage is very justly regarded as a fundamental article of republican government."

*The Federalist,* No. 51.

Accordingly the people of the different States in framing their constitutions were careful to describe the class of individuals who were to exercise the right of suffrage.

The class of citizens thus pointed out were intended, without increase or diminution by legislative action, to wield the sovereignty of the State until otherwise provided by the alteration of the Constitution.

For the idea cannot reasonably be entertained for a moment that the people of the State, in adopting their organic law creating a legislature and delegating to it the exercise of only a portion of the sovereign power of the people for the purpose of government, intended that their creature should have the right to strip them of their sovereignty.

They did not intend that the servant should be above his master, or the creature superior to its creator.

Nor did they intend that their legislature — their mere agent and servant—should have power to exclude any of the class of citi-

zens in whom they had vested practically the whole sovereignty of the State from the exercise of the right of suffrage.

For the same legislative power which could deny the right to one could deny it to all, and put an end to self-government.

Therefore no legislature has either the right or the power to deny, restrict or interfere with the exercise of the elective franchise as recognized by the Constitution.

The constitutional provisions for the exercise of that supreme political right are from the essential nature of the principles upon which free government is based to be liberally construed.

In *United States v. Slater*, 4 Woods, 356, the Court say :

" Our government is founded on the elective franchise.   The right to exercise this franchise is declared, defined and guaranteed by organic provisions superior to any of the departments of the government.   The legislature cannot enlarge it or restrict it, and can only regulate it so far as their authority to do so is expressly, or by necessary implication, given in the Constitution.   Much less may the courts presume to restrict it by construction.   On the contrary, the whole spirit of our institutions constrains the courts to give our organic provisions, on the subject of the enjoyment of the right of suffrage, such a construction as will permit the most liberal exercise of this supreme right which is at all reasonable consistent with the terms of those provisions."

In *Henshaw v. Foster*, 9 Pick. 312, 316, Parker, C. J., delivering the opinion of the Court, says :

" In construing so important an instrument as a constitution, especially those parts which affect the vital principle of a republican government, the elective franchise, or the manner of exercising it, we are not, on the one hand, to indulge ingenious speculations, which may lead us wide from the true sense and spirit of the instrument ; nor on the other, to apply to it such narrow and constrained views as may exclude the real object and intent of those who framed it. * * * If an enlarged sense of any particular form of expression should be necessary to accomplish so great an object as the

convenient exercise of the fundamental privilege or right, that of election, such sense must be attributed."

Cooley says:

"Narrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves, for themselves, and designed as a chart upon which every man, learned and unlearned, may be able to trace the leading principles of government." *Cooley's Const. Lim.*, 59.

Under the Constitution of Delaware the right of suffrage, although its exercise depends upon compliance with certain constitutional prerequisites or conditions, is vested in the male citizen of the State, of the age of twenty-one years or upwards, except idiots, insane persons, paupers and persons convicted of a crime deemed by law felony; and this right can be divested only through forfeiture as a punishment for crime judicially ascertained.

The class thus vested with this right is distinctly defined by the Constitution and no power exists in the legislature either to increase or diminish this class.

The right can be lost only through forfeiture as a punishment for crime.

For the specification in the Constitution of the means by which the right may be forfeited is a constitutional prohibition against the forfeiture of the right by any other means.

*McCafferty v. Guyer*, 59 Pa. St., 109; *Page v. Allen*, 58 Pa. St., 338, 346; *Barker v. The People*, 20 Johns, 457.

"When the Constitution defines the circumstances under which a right may be exercised or a penalty imposed, the specification is an implied prohibition against legislative interference, to add to the condition, or to extend the penalty to other cases."

*Cooley on Const. Lim.*, 64.

Failure to pay a poll tax is no crime under the laws of Delaware, and thus furnishes no ground for the forfeiture of that right.

And before the right of suffrage can be lost even as a punishment for crime, the alleged crime must be judicially ascertained.

*McCafferty v. Guyer*, 59 Pa. St., 109.

The Constitution prescribes certain prerequisites or conditions for the exercise of the right of suffrage.

But these provisions prescribe prerequisites or conditions, not for the *existence of the right* of suffrage, but merely for its *exercise.*

The right of suffrage does not grow out of residence in the State for a year, or in the county for a month, or the payment of a county tax.

It grows out of the fact that the person possessing it is a male citizen of the State of the age of twenty-one years or upwards, and is included in the class of individuals whom the people of the State have by their organic law recognized as the depositaries of sovereignty.

Residence in the State for a year and in the county for a month and the payment of a county tax are but prerequisites or conditions upon which the right of suffrage already vested can be exercised.

That the framers of the Constitution did not deem the payment of a county tax essential to the existence of the right of suffrage is evident from the fact that they provided that every " male citizen of the age of twenty-one years and under the age of twenty-two years, having resided as aforesaid, shall be entitled to vote without payment of any tax."

Nothing could more clearly show that under the Constitution the payment of a county tax was a prerequisite or condition, not for the existence, but merely for the exercise of the right of suffrage.

The legitimate function of taxation is merely to provide means to defray the expenses of the machinery of government.

It is both unphiosophical and unreasonable to suppose that the framers of the Constitution regarded the right of self-government as having its origin in the payment of a tax, which is but an incident to self-government.

They did not intend to subordinate the principal to its incident.

Furthermore, it is material in this connection to note the phraseology of the Constitution in providing that the citizen who has complied with the constitutional prerequisites or conditions shall not acquire the right of suffrage, but "enjoy the right of an elector."

Every male citizen of the State of the age of twenty-one years or upwards, whose right of suffrage has not been forfeited as a punishment for crime, has a constitutional right to comply with the constitutional prerequisites or conditions for his exercise of the right of suffrage.

When a constitution clearly defines the class of citizens whom it considers fit to be the depositaries of the sovereignty of the State, and prescribes certain prerequisites or conditions on their part for the exercise of that sovereignty, a psychological phenomenon would indeed be presented if the framers of that constitution did not intend that all citizens embraced in that class should have the *right* to comply with such prerequisites or conditions.

And if such be the intention of the Constitution, it inevitably follows that the legislature—the mere creature and servant of the Constitution—cannot directly or indirectly defeat or thwart that intention.

The Constitution requires that the voter must have resided in the State for a year, presumably in order that he may have become familiar with its institutions, and thereby the more intelligently and properly exercise the right of suffrage.

No act of the legislature can deprive him of the right to reside in the State for that year.

The Constitution requires that the voter must have resided in the county where he offers to vote for a month, presumably for the purpose of guarding against frauds upon the elective franchise.

No act of the legislature can deprive him of the right to reside in the county for that month.

The Constitution requires that the voter of the age of twenty-two years or upwards must have paid a county tax within two

years before the election, presumably from the consideration that justice requires that those who exercise the right of suffrage should bear their just share of the expenses of government.

It is submitted that no act of the legislature can deprive him of the right to pay a county tax within those two years.

It may possibly be suggested that the Constitution contains no provision relating to taxation, and therefore that the legislature not only has unrestrained power to tax, but also the unqualified right to determine whether or not during any given period to exercise the power of taxation; and that, if the taxing authorities have the right under legislative enactments to so determine, and shall determine that no tax shall be laid during a given period, the idea of any right on the part of the citizen to comply with the constitutional prerequisite or condition calling for the payment of a tax during that period, is thereby excluded.

But to any suggestion there are several distinct and sufficient answers.

1. The Constitution does not contemplate and intend that the legislature shall posses the unqualified right of determining either directly or indirectly whether during any given period any tax shall be laid; but, on the contrary, contemplates and intends that no such right shall exist in the taxing authorities.

It provides for the periodical election of a governor and general assembly of the State, and recognizes periodical elections of sheriffs and coroners, and intends that the general assembly and these officers shall be elected.

It must be held to intend that the State, for the security and protection of which it was adopted, shall not lapse into confusion and anarchy.

Yet it requires the payment of a county tax by voters of the age of twenty-two years or upwards as a prerequisite or condition for their exercise of the right of election.

Therefore, by necessary implication, it intends that the taxing authorities shall afford an opportunity to male citizens of the age

of twenty-two years or upwards, to pay a county tax, and that such citizens shall have the right to comply with the constitutional prerequisite or condition.

2. To hold that the legislature either directly or through the taxing authorities acting under legislative enactments has the unqualified right during such period as to it or them shall seem proper to render it impossible for male citizens of the age of twenty-two years or upwards to comply with the constitutional prerequisite or condition by preventing them from paying a county tax, would be to decide that the legislature is constitutionally authorized and empowered to extinguish the right of self-government in this State.

For an unqualified power to render impossible compliance with a prerequisite or condition for the exercise of a right is virtually and in law an unqualified power to destroy the right itself.

3. Any suggestion of right in the legislature, either directly or through the taxing authorities, to determine whether or not during any given period the power of county taxation shall be exercised has no logical or necessary relation to the question under discussion.

That question is whether or not the taxing authorities acting under legislative enactments have a constitutional right in *laying a county tax* to exclude any male citizen of the age of twenty-two years or upwards from all opportunity of paying his share, and thereby to prevent him from complying with the constitutional prerequisite or condition for the exercise of his right of suffrage.

And so far as the Constitution is concerned, it matters not whether the action of the authorities assumes the form, on the one hand, of the prevention of a citizen from being assessed for a tax, or, on the other, of his prevention from paying a tax which has been assessed against him.

The Constitution regards substance, not form or shadow ; and in either case the result is the same.

Clearly the legislature has no authority to authorize the taxing

officials, while engaged in the exercise of the power of taxation, to exclude any male citizen of the age of twenty-two years or upwards from his right to be assessed and pay a tax, and thereby comply with the constitutional prerequisite or condition.

4. Both the Constitution and the history of the elective franchise in Delaware show that the framers of the Constitution did not intend that the legislature should have the power to exclude the voting class of citizens from exercising their right of suffrage by thus arbitrarily preventing them from complying with the constitutional prerequisite or condition of the payment of a tax.

(a) Section 3 of Article I of the Constitution declares that " all elections shall be free and equal."

Here is a guaranty by the organic law that the class of citizens, in whom under the Constitution is vested the sovereignty of the State, shall have not only the right after complying with the constitutional prerequisites or conditions to equally enjoy the elective franchise, but also the right to freely comply with those prerequisites or conditions and exercise the elective franchise.

Any other interpretation of the guaranty would rob it of its force and vitality, and substitute shadow for substance.

*Patterson v. Barlow*, 60 Pa. St., 54, 67.

(b) Section 2 of Article IV of the Constitution provides that " electors shall in all cases, except treason, felony or breach of the peace, be privileged from arrest during their attendance at elections and in going to and returning from them."

This provision is a clear recognition by the Constitution that it is of concern to the State that electors shall freely exercise the right of suffrage.

Even in colonial times the same State policy was recognized in Delaware.

The General Assembly of the Three Lower Counties on Delaware in 1733 enacted that " every person within this government, qualified to elect according to the directions of this act, refusing or neglecting (not being hindered by sickness or other unavoidable

accident) to attend at the election, and to give in his vote, and being thereof legally convicted by the oath or affirmation of one credible witness, before the Justices at their next Court of General Quarter Sessions of the Peace, to be held for the county to which he belongs, shall be fined the sum of twenty shillings, one half thereof to be paid to the treasurer for the use of the county, and the other half to any person who will sue for the same."

While this enactment may be regarded as extreme, it yet serves to disclose the same public policy recognized in the Constitution.

Precisely the same policy which demands the exercise of the right of suffrage by those citizens of the voting class who have complied with the constitutional prerequisites or conditions, equally demands that other citizens of the voting class who are ready and willing to comply with those prerequisites or conditions should have the right so to do.

(c) To hold that any male citizen of the age of twenty-two years or upwords belonging to the voting class has not a right to pay a county tax in order to enjoy the right of an elector, would be to decide that Delaware has not advanced but has retrograded in the cause of free government.

In the Charter of Privileges, granted in 1701 by William Penn to the inhabitants of Pennsylvania and the Three Lower Counties on Delaware, it was provided that "for the well governing of this province and territories, there shall be an assembly yearly chosen, by the freemen thereof, to consist of four persons out of each county," &c., and that "the qualifications of electors and elected   *   *   *   shall be and remain as by a law of this government made at New Castle in the year One Thousand Seven Hundred, entitled, *An Act to ascertain the number of Members of Assembly, and to regulate the elections."*

*1 Del. Laws,* App. 39, 40.

The Act of 1700 above referred to contained the following provision relating to the qualification of electors and elected:

"No inhabitant of this Province and Territories shall have right of electing or being elected as aforesaid unless he or they be natural or native born subject or subjects of England or be naturalized in England or in this Province and Territories and unless such person or persons as aforesaid be of the age of twenty-one years or upwards and be a freeholder or freeholders of this Province or Territories and have fifty acres of land or more well seated and twelve acres thereof or more cleared and improved or be otherwise worth fifty pounds lawful money of this government clear estate and have been resident therein for the space of two years before such election."

By " an Act for regulating elections, and ascertaining the number of the Members of the Assembly," passed in or about 1732, substantially the same qualifications for the exercise of the right of suffrage are required, forty pounds lawful money being substituted in lieu of fifty pounds as a qualification.

*1 Del. Laws*, 146.

Thus the law remained until the adoption of the Constitution of 1776, when it was incorporated in the organic law of the State.

*1 Del. Laws*, App. 83.

By the Constitution of 1792 it was provided that " every white freeman of the age of twenty-one years, having resided in the State two years next before the election, and within that time paid a state or county tax, which shall have been assessed at least six months before the election, shall enjoy the right of an elector; and the sons of persons so qualified, shall between the ages of twenty-one and twenty-two years, be entitled to vote, although they shall not have paid taxes."

It thus appears that prior to the Constitution of 1792, while a property qualification was in Delaware necessary for an elector, the payment of tax was never required as a prerequisite or condition for the exercise of the right of suffrage.

Before the adoption of that Constitution the right of citizens

to qualify themselves to exercise the right of self-government was beyond the reach of legislative prevention or denial.

No legislative enactment could prevent them from or hinder them in acquiring property real or personal of a sufficient amount or value to meet the requirement for the enjoyment of an elector.

In them was vested the right, indefeasible except for crime, to qualify themselves to vote.

It is beyond belief that, when the Constitution of 1792 substituted the payment of a tax in lieu of the ownership of property as a prerequisite or condition for the enjoyment of the elective franchise, it intended anything else than that the citizen should have a right to pay that tax, and exercise the right of suffrage.

And the same statement *a fortiori* applies to the Constitution now in force.

5. In the exercise of the taxing power the legislature is necessarily clothed with large discretion, and may either directly or through the proper county authorities determine the times and manner in which county taxes shall be assessed and collected.

But such determination of times and manner must be in subordination and not repugnant to constitutional guaranties.

If the legislature could and should validly enact that county taxes should be assessed, instead of annually, only biennially in the year of the general election within five months next before such election, and that the authority of the collector to receive taxes should expire on the last day of October preceding such election, at which time all uncollected taxes should be deemed extinguished, every male citizen of the State of the age of twenty-two years or upwards, belonging to the voting class would be absolutely disfranchised.

For no such citizen could comply with the constitutional prerequisite or condition of the payment of a county tax within two years next before the election, which shall have been assessed at least six months before the election.

But no Court would hesitate for an instant to brush aside such

an enactment as violative of the constitutional right of citizens to qualify themselves to vote.

The fact that citizens of the age of twenty-one years and under the age of twenty-two years are not required to pay a county tax as a prerequisite or condition for their enjoyment of the right of electors, is potent evidence that the Constitution intends that citizens of the age of twenty-two years or upwards shall have the right to pay such tax for their qualification to vote.

It clearly shows that the framers of the Constitution intended that citizens belonging to the voting class should not be disfranchised by the non-payment of a county tax, which they have no opportunity under the law to pay.

It is a necessary implication that, in prescribing the payment of a county tax as a prerequisite or condition for the exercise of the elective franchise by citizens of the age of twenty-two years or upwards, the Constitution intended they should have the right to pay such tax.

For precisely the same policy which dispenses with the payment of a tax in the one case, requires that there should be a right to pay it in the other.

It is, therefore, submitted that every male citizen of the State of the age of twenty-two years or upwards who belongs to the voting class and whose right of suffrage has not been forfeited for crime has a constitutional right to be assessed for a county tax and to qualify himself to vote by the payment of that tax within two years next before the election.

Every male citizen of the State of the age of twenty-two years or upwards, who is not excepted by the Constitution from the voting class, and who has not been convicted of felony, has a constitutional right to be assessed for a county tax and to qualify himself to enjoy the right of an elector by the payment of that tax in each of the two years next preceding the election.

The constitutional prerequisite or condition—" having within two years next before the election, paid a county tax, which shall

3

have been asseessed at least six months before the election,"—contemplates and intends that the citizen shall have the right to pay a county tax in each or either of these two years.

This constitutional provision must be read in the light furnished by the system of taxation in existence in Delaware at the time of its adoption.

That system, like the system now in force, was not one of biennial, but of annual taxation.

It provided that " The Levy Court and Court of Appeal *shall every year* calculate and settle   *   *   *   the amount of the county tax, &c."

*Digest of Del. Laws*, 1829, 377.

It further provided that " every freeman above the age of twenty-one years shall be rated, in addition to his assessment, a personal tax for a capital not exceeding one thousand pounds nor less than fifty pounds, at the discretion of the assessors." *Id.*, p. 390.

The Constitution, adopted while this system was in force, clearly intended *at least* that so long as county taxes continued to be annually assessed all male citizens of the age of twenty-two years or upwards belonging to the voting class should have the right to comply with the constitutional prerequisite or condition by the payment of a tax in either or each of the two years.

To read the provision differently would do violence to that principle of liberal interpretation which peculiarly applies to constitutsonal guaranties relating to the fundamental right of suffrage.

But if there were room for any doubt upon this point, any such doubt would be immediately removed by glancing at the history of the adoption of the provision in question.

And for this purpose the proceedings of the Constitutional Convention of 1831 may properly be referred to.

*Cooley on Const. Lim.*, 66 ; *State v. Kennon*, 7 Ohio St., 547, 563 ; *The People v. Purdy*, 2 Hill, 31, 37 ; *Clark v. The People*, 26 Wend., 599, 602 ; *McCafferty v. Guyer*, 59 Pa. St., 109, 112.

The committee on the right of suffrage had made a report in

favor of excluding all citizens from voting who had not paid a tax within *one* year next before the election.

"Mr. Clayton said there was another part of the report which he thought required amendment. The report excludes all from voting who have not paid a tax within *one year*. He presumed this was through inadvertence, and that the committee had, following the train of ideas produced by changing the term of residence from two years to one, through inadvertence changed the time within which a tax must be paid to qualify a man to vote, from two years to one. It might be that very good men might neglect to pay their tax within a year, and thus lose their votes. It might be that a collector might be so forgetful of his duty, as not to give them an opportunity to pay their tax in time to vote. He therefore proposed to strike out 'one year' and insert 'two years.'

Judge Hall thought no possible inconvenience could result from requiring each man to pay his tax in the year in which it was due. As the term of residence had been changed from two years to one, it was a continuation of the idea to require the payment of the tax within a year preceding an election.

Mr. Clayton replied that many citizens depended on paying their tax on the day of the election. On that day the collector might be absent, from sickness, from accident, or perhaps from design, and thereby drive hundreds from the polls. It would be well, if we could, to make each man pay his taxes within the year; but we might thereby drive away many valuable voters.

The amendment proposed by Mr. Clayton was adopted."

*Harker's Debates*, 24.

Thus the history of the adoption of the constitutional prerequisites or condition in question shows beyond all controversy that the Constitution intends that the male citizen of the age of twenty-two years or upwards shall have the right to pay a county tax at any time within two years next before the election and thereby qualify himself to vote.

Yet the legislature of 1873 requires that the poll taxable who

is returned as a delinquent for non-payment of his tax for the first year shall be dropped from the assessment list, thereby preventing him not only from paying a tax for the second year, but also from paying his tax for the first year.

The legislature, while it may provide reasonable regulations for the exercise of the elective franchise, designed to secure and facilitate the fair, free, orderly and convenient conduct of elections has no constitutional authority to deny, abridge, impair or restrain the right of suffrage, or add to or take from the constitutional qualifications of electors, or unnecessarily impede, embarrass or render more difficult the enjoyment of the right.

*Cooley on Const. Lim.*, 616 ; *Capen v. Foster*, 12 Pick., 485-489 ; *Page v. Allen*, 58 Pa. St., 338, 346, 351 ; *McCafferty v. Guyer*, 59, Pa. St., 109 ; *Patterson v. Barlow*, 60 Pa. St., 54, 67, 71.

In *Daggett v. Hudson*, 43 Ohio St., 548, a registration act which allowed only seven specified days within the year in which to regiter and correct registration of voters was held unconstitutional and void.    The Court say, p. 561 :

" The legislature has full power to regulate the right to vote, but no constitutional power to restrain or abridge the right, or unnecessarily to impede its free exercise.    Under the pretence of regulation the right of suffrage must be left untrammeled by any provision or even rules of evidence that may injuriously or necessarily impair it, and so the citizen cannot forfeit the right except by his own neglect, or by such peculiar accidents as are not attributable to the law itself.    So upon this part of the case our conclusion is that the legislature may enact registration laws, but they must be for the regulation only, and must not unnecessarily abridge or impair the right of suffrage secured to every elector by the Constitution."

In *State v. Fitzgerald*, 32 N. W. Rep., 788, the Supreme Court of Minnesota held an act unconstitutional, which assumed to establish an election district, but failed to provide the means by which an election could be held.

In *Attorney General v. Detroit,* 24 N. W. Rep., 887, the Supreme Court of Michigan held that an act providing for a board of registration was unconstutional as attempting to add to the constitutional conditions upon which the right of suffrage could be exercised.

In *Dells v. Kennedy,* 6 N. W. Rep., 246, the Supreme Court of Wisconsin say :

" The elector possessing the qualifications prescribed by the Constitution is invested with the constitutional right to vote at any election in this State. These qualifications are explicit, exclusive, and unqualified by any exceptions, provisos or conditions, and the Constitution, either directly or by implication, confers no authority upon the legislature to change, impair, add to or abridge them in any respect. * * * No registry law can be sustained which prescribes qualifications of an elector, *additional* to those named in the Constitution, and a registry law can be sustained only, if at all, as providing a reasonable mode or method by which the constitutional qualifications of an elector may be ascertained and determined, or as regulating reasonably the exercise of the constitutional right to vote at an election. If the mode or method, or regulations, prescribed by law for such purpose, and to such end, deprive a fully qualified elector of his righ to vote at any election, without his fault and against his will, and require of him what is impracticable or impossible, and make his right to vote depend upon a condition which he is unable to perform, they are as destructive of his constitutional right, and make the law itself as void, as if it directly and arbitrarily disfranchised him without any pretended cause or reason, or required of an elector qualifications additional to those named in the Constitution. It would be attempting to do indirectly what no one would claim could be done directly."

In *Rison et al. v. Farr,* 24 Ark., 161, 171, the Court say :

" The right of those having the constitutional qualifications to vote, is founded in the fundamental law of the land, and cannot be legislated away. The right of suffrage in this State, if not an

inherent, is at least a constitutional right, and whoever possesses the required qualification, cannot be restrained from the exercise of that right except by the alteration of the Constitution; and any law infringing upon that right as vested by the Constitution is null and void. * * * If the legislature cannot, by direct legislation, prohibit those who possess the constitutional qualification to vote, from exercising the elective franchise, that end cannot be accomplished by indirect legislation. The legislature cannot, under color of regulating the manner of holding elections, which to some extent that body has a right to do, impose such restrictions as will have the effect to take away the right to vote as secured by the Constitution."

In *People v. Canady*, 73 N. C., 198, it was held that, the Constitution requires thirty days residence in the county as a condition for exercising the right of suffrage, an act requiring ninety days residence therein was unconstitutional.

In *Quinn v. The State*, 35 Ind., 485, the Court say:

" We are of the opinion that these enactments are unconstitutional and void. The Constitution requires only that the person shall be a resident of the township or precinct, in order to entitle him to vote, if he possesses the other qualifications, and the legislature cannot say that this residence shall be, or shall have been, for any specific length of time. If it can say that it shall require twenty days to constitute a residence, why may it not say that it shall require ninety, or three hundred and sixty-five days?"

*Cooley* says: "All regulations of the elective franchise, however, must be reasonable, uniform, and impartial; they must not have for their purpose directly or indirectly to deny or abridge the constitutional right of citizens to vote, or unnecessarily to impede its exercise; if they do, they must be declared void."

*Cooley's Const. Lim.*, 602.

In *State v. Constantine*, 42 Ohio St., 437, it was held that a statute authorizing the election of four members of a police board, but denying to an elector the right to vote for more than two mem-

bers, was unconstitutional; the elector being by the Constitution "entitled to vote at all elections."

The principle of the foregoing cases is supported and illustrated by abundant authority.

*State v. Conner*, 34 N. W. Rep., 499 ; *State v. Tuttle*, 9 N. W., 791 ; *Kineen v. Wells*, 11 N. E. Rep., 916 ; *State v. Baker*, 38 Wis., 71 ; *Monroe v. Collins*, 17 Ohio St., 666 ; *State v. Williams*, 5 Wis., 308 ; *People v. Maynard*, 15 Mich., 463 ; *Paine on Elections*, Section 340 ; *McCrary on Elections*, Sections 13, 17.

The legislature having no constitutional power to deny, abridge or embarrass the exercise of the elective franchise by any direct legislation, such denial, abridgment or embarrassment cannot constitutionally be effected through indirect legislation, although directly relating to other subjects than the right of suffrage.

In *Cummings v. The State of Missouri*, 4 Wall., 277, it was held that certain provisions of the Constitution of Missouri requiring priests and clergymen, in order to preach and teach, to take and subscribe an oath that they had not committed certain penal acts, although in form imposing merely a condition upon their right to exercise their profession, were in substance a bill of attainder, and as such forbidden by the Constitution of the United States and void.

In *Woodbridge v. City of Detroit*, 8 Mich , 274, 306, Christiancy, J., says :

" Where indirect means are employed to accomplish what is forbidden to be done directly, the law rejects these indirect means, as of no validity, and treats the case as if the same end were obtained by direct means."

In *Parrott's Chinese Case*, 6 Sawyer, 349, 382, 383, Sawyer, J., says :

" The end sought to be attained is unlawful. It is in direct violation of our treaty stipulations and the Constitution of the United States. The end being unlawful and repugnant to the supreme law of the land, it is equally unlawful, and equally in violation of the constitution and treaty stipulations, to use any means,

however proper, or within the power of the State for lawful pur-
poses, for the attainment of that unlawful end, or accomplishment
of that unlawful purpose. It cannot be otherwise than unlawful
to use any means whatever to accomplish an unlawful purpose.  *
*   *   And whatever form the law may take on, or in whatever
language be couched, the court will strip off its disguise, and judge
of the purpose from the manifest intent as indicated by the effect."

In *Davies v. McKeeby*, 5 Nev. 369, the Court say :

" The form of the law by which an individual is deprived of
a constitutional right is immaterial.   The test of its constitutionality
is whether it operates to deprive any person of a right guaranteed
or given to him by the Constitution.   If it does, it is a nullity—
whatever may be its form.   Surely a law which deprives a person
of a right by requiring him to take an oath which he cannot take
is no less objectionable than one depriving him of such right in
direct terms.   To make the enjoyment of a right depend upon an
impossible condition, or upon the doing of that which cannot
legally be done, is equivalent to an absolute denial of the right
under any condition.   The effect, and not the language of the law
in such case, must determine its constitutionality.   It would not be
doubted for a moment, that a law expressly denying the elective
franchise to any person upon whom the Constitution confers it,
would be unconstitutional.   Why, then, is a law less objectionable
which, although not expressly and directly, yet no less certainly
denies the right ?"

The provisions of the legislation of 1873 upon which the de-
fendants rely add to the constitutional qualifications of electors, un-
necessarily impede and embarrass the enjoyment of the right of
suffrage, and abridge and impair that right, and are therefore un-
constitutional.

Under the legislation of 1873 all delinquent poll taxables who
are returned as such must be dropped from the assessment list.

The allowance to the collector of the amount of their taxes as
delinquent extinguishes them.

Those who have failed to pay their poll tax and are returned as delinquent have therefore no opportunity thereafter of paying the tax for the preceding year.

They have no opportunity of paying a poll tax for the year in which they are returned as delinquent, because their names are dropped from the assessment list.

Thus in order that the poll taxable may comply with the constitutional prerequisite or condition by the payment of a county tax within two years next before the election, it is necessary that he shall pay a tax by the first Tuesday in March next before the election, viz : at least eight months before the election.

His constitutional right to qualify himself to vote by the payment of a tax in each or either of the two years is abridged, in that, instead of having two years in which to comply with the prerequisite or condition, he is restrained to sixteen months.

Again, the Constitution in requiring that the elector shall pay county tax, " which shall have been assessed at least six months before the election," clearly intends that the assessment of that tax may be made in the year of the election.

Yet the legislature has undertaken to prevent the poll taxable from exercising the right of an elector unless he has paid a tax assessed twenty months before the election.

In order to justify the legislation of 1873 the Constitution would have to be so altered as to read thus : " having within two years next before the election paid a county tax, which shall have been assessed at least six months before the election, *provided he paid a county tax at least eight months before the election, which shall have been assessed at least twenty months before the election.*"

But such an alteration would be by way of addition to the constitutional qualifications of electors, and such additions are beyond the power of the legislature.

The same principle which would permit the legislature to require the payment of a tax eight months before the election, would

allow it to require such payment one year and eleven months before the election.

The legislature of 1873 was neither intended or calculated to secure and facilitate the fair, free, orderly and convenient conduct of elections.

On the contrary, it seeks to abridge, impair and embarrass the constitutional right of citizens to enjoy the elective franchise, and strikes at the most vital principle of a republican form of government, the sovereignty of the people.

Tested by reason and authority that legislation must be declared unconstitutional.

The provisions of the legislation of 1873 upon which the defendants rely are violative of the constitutional guaranty that " all elections shall be free and equal," and are therefore unconstitutional.

Under the legislation of 1873 elections are not equal.

The Constitution, regarding substance rather than form, in providing that elections shall be free and equal demands that all citizens belonging to the class in which the whole sovereignty of the State practically resides, shall not only have the right to vote after complying with the constitutional prerequisites or conditions, but also the right to comply with those prerequisites or conditions.

But the legislation in question, far from observing the constitutional rule of equality, is designed and operates to produce the most glaring inequality.

It discriminates between those citizens of the voting class who are property owners, and those citizens of that class who do not own property.

While it strikes from the assessment list pole taxables who are returned as delinquent, it retains on that list property taxables who are in default.

It discriminates even between poll taxables who have failed to pay their tax; striking from the assessment list those whom the

collector chooses to return as delinquent, and retaining on that list those whom the collector prefers not to so return.

It makes sport of the principles of free-government, ruthlessly destroying both the freedom and equality of elections, and thereby grossly violating the organic law of the State.

It is therefore submitted that the provisions of the legislation of 1873 upon which the defendants rely, whether considered as a fiscal regulation of the State, or as a regulation of the elective franchise or its exercise, are unconstitutional.

The provisions of the legislation of 1873 upon which the defendant's rely being unconstitutional, the defendant's are personally liable in this action.

An unconstitutional statute is a nullity and cannot afford protection to any person acting under it.

*Cooley on Const. Lim.,* 188 ; *Brown v. Hummel,* 6 Pa. St., 86 ; *Taylor v. Porter,* 4 Hill, 140 ; *Kelly v. Bemis,* 4 Gray, 83 ; *Astrom v. Hammond,* 3 McLean, 107 ; *Woolsey v. Dodge,* 6 McLean, 142, 146 ; *Sumner v. Beeler,* 50 Ind., 341 ; *Norton v. Shelby County,* 118 U. S., 425, 442.

The legislation in question being absolutely null and void, the defendants were bound under the laws of the State not to strike the name of the plaintiff from the assessment list, but, on the contrary, to retain his name upon that list and assess a county tax upon him for 1886.

This legal duty the defendants violated, thereby illegally and wrongfully denying to the plaintiff his right to qualify himself to enjoy the right of an elector, and as a necessary result illegally and wrongfully prevented the plaintiff from exercising his right as an elector.

This denial of right to the plaintiff worked a legal injury to him, for which damages are recoverable in this action.

For the wrongful deprivation of the citizen of the right to vote, or prevention of his exercise of that right, is an actionable injury.

*Ashby v. White,* 2 Ld. Raymond, 938, 953, 958.

In *Lincoln v. Hapgood et al.,* 11 Mass., 350, it was held that an action would lie for the refusal to receive the vote of a qualified elector.

The function which the defendants were legally bound to discharge, in continuing the name of the plaintiff on the assessment list and assessing a county tax against him, was in no sense discretionary, judicial or quasi judicial; but was purely ministerial.

Persons exercising ministerial functions are liable for injuries done by them under an unconstitutional statute; nor does the fact that they are public officers shield them from liability.

*Astrom v. Hammond,* 3 McLean, 107.

And whenever a ministerial officer is charged by law with the performance of a certain duty, though due primarily to the public, and through his malfeasance, misfeasance or nonfeasance with respect to that duty, an injury results to an individual who has a special interest in the proper performance of such duty, the officer is liable in damages.

*Henly v. The Mayor of Lyme,* 5 Bing., 91; *Hover v. Barkhoof,* 44 N. Y., 113; *Clark v. Miller,* 54 N. Y., 528.

In *Clark v. Miller, supra,* the Court say:

"A ministerial officer charged by statute with an absolute and certain duty, in the performance of which an individual has a special interest, is liable to an action if he refuses and omits to perform it."

Therefore, whether the provisions of the legislation of 1873 upon which ths defendants rely be considered unconstitutional as a regulation of taxation, or as a regulation of the elective franchise or its exercise, or unconstitutional upon both grounds, the defendants are personally liable to the plaintiff in this action.

*John H. Rodney* and *George Gray,* for defendants:

The enactment of the provision for dropping the names of

delinquents from the assessment list, and of excluding names so dropped for the period of twelve months as contained in Section 1, of Chapter 372 of Delaware Laws, is valid and constitutional.

### SYNOPSIS OF CONSTITUTIONAL AND STATUTORY PROVISIONS.

In order to clearly present the question at issue before the Court, it is thought advisable to submit the various steps and processes to be taken before any one can be qualified as an elector. The Constitution requires two distinct qualifications; (1) residence in the State for one year and in the County for one month before the election, and (2), payment, within two years next before the election, of a county tax which shall have been assessed at least six months before the election. With the first of these qualifications we have nothing to do in this case. In order to acquire the second qualification, the elector must comply with the Statutory provisions respecting the assessment and collection of taxes.

The law provides that there shall be every four years, a general assessment of persons and property, and every year a special assessment of the persons of those liable, who have arrived at the age of twenty-one years since the preceding assessment, or who have come to reside in the hundred, or who have been before omitted.

*Rev. Code*, Ch. 11, Secs. 2 and 3.

Following this, by Chapter 371, Vol. 14, Laws of Del., the assessor is required to post the assessment list so made by him in at least five public places of the hundred, and at the same time, places, and in the same manner, he shall give notice that he will attend at the place of holding the general election in the said hundred on a day named in the said notice between certain hours therein named to correct any errors in his assessment, and for the purpose of assessing any person who may have been omitted.

It then becomes his duty to add to the assessment the names of all persons who shall appear before him and prove their right

to be assessed, with a penalty for the non-performance of this duty.

By Section 17 of Chapter 10, such assessor shall return his assessment to the Levy Court on the first Tuesday of February.

By Sec. 6 of Chapter 371 aforesaid, it is made unlawful for the Levy Court, or any member thereof, to take from the assessment returned to said Levy Court by any assessor the name of any person appearing thereon.

By the same section the Levy Court are authorized to add to the assessment list the name of any person making personal application and proving his right to be so assessed, subject to this provision for the addition of names omitted; and the list so returned to the Levy Court is final.

The Levy Court then proceeds to ascertain the amount which is necessary to be raised by taxation for the ensuing year and apportion and lay the taxes for the same by assessment in the several hundreds. *Rev. Code*, Ch. 8, Sec. 18.

The Levy Court is required to meet on the first Tuesday in March for business connected with the assessment; Ch. 8, Sec. 11, and the assessment is required to be entirely completed by the last day of March, and no additions can be made to it thereafter.

After completing the assessment and laying the taxes the Levy Court is required to issue a duplicate to the collector on or before the first Tuesday in April. Sec. 18.

The duties of the collector are, within thirty days after he shall have received his duplicate, to give public notice by advertisement in the manner prescribed by law, stating his place of residence or of business and his readiness to receive the taxes; and, also, in the month of January in each year, again to give notice as aforesaid. It is the duty of the collector then to return to the Levy Court as delinquents the names of all persons who did not appear and pay their taxes.

*Rev. Code*, Ch. 8, Sec. 21.

On the collector making an affidavit that he has given the

notices as aforesaid, it becomes the duty of the Levy Court to allow the said collector, as delinquencies, the taxes uncollected by him, and the law provides that the names of such delinquents shall be dropped from the assessment list by the Levy Court, and shall not be placed thereon again for a period of twelve months from and after the date of such allowance. It is this provision which is called in question in this suit.

From this brief synopsis it appears, and must be borne in mind in this suit, that the system of laws which provides for the assessment and collection of taxes, has a two-fold aspect.

Its primary purpose is the raising of revenue, but the payment of a tax being a constitutional pre-requisite for voting, it is under these revenue laws that the right of voting is acquired.

It is with the latter function of this machinery that we have now specially to deal, but in determining the power of the Legislature over the whole subject it must not be overlooked that their passage is an exercise of that most unlimited of all the Sovereign powers of a State—the power of taxation.

A law will not be declared unconstitutional unless it appears to the Court to be so, clearly and beyond a reasonable doubt.

Judge Cooley well states the caution required in declaring laws unconstitutional when he says, " The moment a court venture to substitute its own judgment for that of the Legislature, in any case where the constitution has vested the Legislature with power over the subject, that moment it enters upon a field where it is impossible to set limits to its authority, and where its discretion alone will measure the extent of its interference."

" The rule of law upon this subject appears to be, that, except where the constitution has imposed limits upon the legislative power it must be considered as practically absolute, whether it operate according to natural justice or not in any particular case. The courts are not the guardians of the rights of the people of the State, except as those rights are secured by some constitutional provision which comes within the judicial cognizance. The pro-

tection against unwise or oppressive legislation within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the people.   If this fail, the people in their sovereign capacity can correct the evil ; but courts cannot assume their rights. The judiciary can only arrest the execution of a statute when it conflicts with the constitution.   It cannot run a race of opinions upon points of right, reason, and expediency with the law-making power."

*Cooley Const. Lim.*, 167 (2d Ed.); *Eakin v. Raub*, 12 S. & R., 330, 340 ; *People v. Blodgett*, 13 Mich., 127, 161 ; *Sears v. Cottrell*, 5 Mich., 250, 253 ; *People v. Gallagher*, 4 Mich., 243 ; *Tyler v. People*, 8 Mich., 319, 333.

Courts ought not to declare a law unconstitutional unless its repugnance to the constitution is direct and clear.

*Bruce v. Schuyler*, 4 Gilman, (Ills.) 221, 272 ; *People v. Marshall*, 1 Ib., 672 ; *Lane v. Dorman*, 3 Scam., 238, 240.

Presumption is in favor of constitutionalty.   To authorize a court to declare otherwise, its repugnance to the Constitution must clearly appear.

*Hawthorn v. People*, 109 Ills., 302, 307 ; *Foster v. Essex Bank*, 16 Mass., 245, 269.

The question whether a law be void for its repugnancy to the constitution, is, at all times, a question of much delicacy, which subject seldom, if ever, to be decided in the affirmative, in a doubtful case.     *     *     *     *     But it is not a subject of implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered void.   The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other."

*Fletcher v. Peck*, 6 Cranch., 87, 128 ; *Ex parte McCollom*, 1 Cow., 564; *Clark v. The People*, 26 Wend., 598 (1841 overruling case of *People v. Ram.*, 23 Wend., 414,); *Fletcher v. Peck*, 6 Cranch, 128 ; *Cochran v. Van Sorley*, 20 Wind., 382 ; *People v.*

*Morrell*, 21 Wend., 584; *Gibson v. Ogden*, 9 Wheat, 188; 6 Cranch, 188; 1 Cowen, 564: *Newell v. People*, 3 Seld, 109.

While we consider that the provisions of the Constitution of the United States have no relation to this case, yet anticipating any claim that the provision of law in question is obnoxious to one of the recent amendments, it may be proper to refer to the construction of those amendments by the Supreme Court of the United States. It will be convenient to dispose of this subject before considering the relation of the act in question, to the Constitution of the State.

That Court has settled the principle that the Constitution of the United States has no relation to the right of voting in the States, except to secure that right against any denial or abridgement on account of race, color or previous condition of servitude.

The line of decisions on the construction of the Fourteenth and Fifteenth Amendments is clearly to the effect that the former has no relation to the right of suffrage, and the latter only that above indicated.

The first elaborate examination of the Fourteenth Amendment was in the Slaughter House cases, and it was then determined that citizenship of the State and of the United States are different, and depend on different characteristics and circumstances in the individual.

It was also expressly held that the privileges and immunities secured by the Fourteenth Amendment, are those belonging to citizenship of the United States, and not to that of the State.

*Slaughter House cases*, 16 Wall., 86, 74, 76.

Soon after the same Court decided that suffrage was not conferred by the Fourteenth Amendment; that the United States has no voters of its own creation, and that suffrage is not a privilege or immunity of citizenship of the United States, either originally or under the Fourteenth Amendment.

*Minor v. Happersett*, 21 Wall., 162, 170, 173.

The same principle had been determined by Mr. Justice

4

Blatchford, before the last decision, in the Circuit Court of the United States at New York.

*U. S. v. Anthony*, 11 Blatchf., 200.

The words privileges and immunities had been long before accurately defined and their scope determined by Mr. Justice Washington, and his definition was approved and adopted by the Supreme Court in *The Slaughter House cases*, 16 Wall, at page 75, and the Court refers to its prior approval of the same in *Ward v. The State of Maryland*, 4 Wall, 430. The Court then clearly expressed the opinion that the Fourteenth Amendment did not add anything to the words " privileges and immunities " as contained in the original constitution. Judge Washington's characterization of these terms is in. *Corfield v. Coryell* 4 Wash. C. C., 380.

In a later one of the same line of cases it was held that the Fifteenth Amendment of the Constitution of the U. S., does not confer the right of suffrage on any one. Its sole effect is to prevent the States from giving preference to one citizen over another on account of race, color, or previous condition of servitude.

*United States v. Reese*, 92 U. S., 214, 217.

The right of suffrage is not a necessary attribute of national citizenship; but only exemption from discrimination in the exercise of that right on account of race, etc., is an attribute of national citizenship.

*U. S. Cruikshank*, 92 U. S., 542, 556.

The right to vote comes from the States and has not been granted or secured by the Constitution of U. S. *Ib.*, 556.

In *Ex parte Yarbrough*, 110 U. S., 651, the syllabus states that *U. S. v. Reese* is qualified and explained. The qualification is only that in case of States from whose Constitutions the word " white " had not been stricken out, the Fifteenth Amendment does in fact confer the right of suffrage on negroes by striking out the word " white."

This qualification does not affect this case.

Constitutional provisions, respecting the qualification of voters,

are usually brief and free from detail. It follows then of necessity that the details must be provided for by law, and the courts have accorded to the Legislatures a large degree of discretion with respect to such legislation. Indeed it is absolutely necessary to do so.

The general principle is that the Legislature has power to make laws for the regulation of elections and that by so doing it does not add any new qualification for voting or abridge the constitutional rights of the elector.

" While it is true that the Legislature cannot add to the constitutional qualifications of electors, yet it must devolve upon that body to establish such regulations as will enable all persons entitled to the privilege to exercise it freely and securely, and exclude all who are not entitled from improper participation therein.'"

*Cooley on Const. Lim.*, 6 1, (2d Ed.)

Among other matters which are treated as within the constitutional power to regulate elections, the most important is to ascertain who are the legal voters. This is usually done by what are called registration laws, which probably afford the best analogy for the purposes of this case.

A law providing for the registration of electors is a constitutional exercise of legislative power. Such a provision " deprives no one of his right, but is only reasonable regulation under which the right may be exercised."

*Cooley Const. Lim.*, 602 ; *Capen v. Foster*, 12 Pick, 485 ; *People v. Kopplekom*, 16 Mich., 343.

A law providing for the close of the registration of electors on a certain day before the election and depriving unregistered electors of their vote is constitutional.

*Capen v. Foster*, 12 Pick, 485 ; *Daggett v. Hudson*, 43 Ohio St., 548 ; *People v. Hoffman*, 116 Ills., 587.

Under our existing laws every person having the right, has an equal opportunity to qualify himself to vote. If he fail to do

so, it is by his own neglect or omission, and his disfranchisement, if it occur, is voluntary.

*State v. Hilmantel*, 21 Wis., 574, 578 ; *State v. Baker*, 38 Wis., 71, 85, 87.

But apart from these considerations, we now approach the real questions, upon which this case hinges and must be decided, and they arise under the general powers of the Legislature over the matter of taxation. It must be conceded, that the Act of Assembly in question, does not contravene in terms, any express, or explicit provision of the Constitution. It remains therefore to be considered, whether there is to be derived from the Constitution any implied restriction, upon the otherwise absolute power of the Legislature, over the matter of taxation. To examine this intelligently let us see where the right to assess and collect taxes is reposed.

The right to levy and collect taxes is in the Legislature

All sovereign power is inherent in the people, acting through the Legislature, except, when expressly restricted by the Constitution ; the Constitution of a State, being a limitation and not a grant of power.

*Cooley on Const. Lim.*, 87.

In this respect differing from the Federal Constitution, which confers legislative powers, only to the extent express grants contained therein.

The power of taxation is an incident of sovereignty, and is co-extensive with that of which it is an incident.

*Cooley on Const. Lim.*, 479 ; *Cooley on Taxation*, 3 and 4.

In its very nature it acknowledges no limit, and the only security against abuse must be found in the responsibility of the Legislature which imposes the tax, to the constituency who are to pay it. The judicial cannot prescribe to the Legislative department of the government, limitations upon the exercise of its acknowledged power.

*Cooley on Taxation*, 3 and 4 ; *Veazie Bank v. 8 Wall*, 508,

533 ; *Carroll v. Perry,* 4 McLean, 25 ; *Weston v. Charleston,* 2 Peters, 449 ; *Lane Co. v. Oregon,* 7 Wall, 71, 77 ; *McCullough v: Maryland,* 4 Wheat, 316, 428.

Therefore the Court cannot by any construction place a limit upon it.

In the exercise of this sovereign power the legislature can prescribe what class of person and property shall be taxed, and what property and what class of persons shall be exempt.

*Brewer Brick Co. v. Inhabitants of Brewer,* 62 Maine, 62.

There is nothing in the Constitution of the State of Delaware, which interferes with or limits the exercise of this sovereign right in the legislative body. What then is the true extent and scope of the provision in question? The Constitution makes no provision for the assessment or collection of a tax but merely restricts the right to vote such persons as shall have paid certain tax ; the amount and character of this tax, the persons affected, and all the details being left to the unrestricted action, and descretion of the Legislature.

" With respect to the mode of exercising the taxing power the Legislature is invested with entire discretion."

*Hilliard Taxation,* 3 ; *Hill v. Higdon,* 5 Ohio (St.), 243, 245.

The imposition, modification and removal of taxes, and the exemption of property therefrom, is an ordinary exercise of the power of State Sovereignty.

*Gilman v. Sheboygan,* 2 Black., 510.

The taxing power of a State is one of its attributes of Sovereignty.

*Union Pac. R. R. Co. v. Panistou.,* 18 Wall., 5 ; *Erie R. R. Co. v. Penp.,* 21 Wall., 492.

So long as a State by its laws prescribing the mode and subject of taxation, does not violate any express provision of the Constitution, the Courts can afford no relief however unjust, oppressive or onerous those laws may be.

The mode of enforcing payment of taxes is wholly within legislative control.

*Witherspoon v. Duncan*, 4 Wall, 210.

The tax which the plaintiff alleges he was prevented from paying, by reason of his non-assessment, was confessedly a "poll" or personal tax.

The whole system of taxation being for revenue, the assessment is a list of taxables, a listing of those liable to pay tax, and in no sense a registration of voters. That this is so, is shown by the fact, that unnaturalized persons, non-residents, corporations and women are so assessed or listed, and called upon to pay taxes.

The assessment of a poll tax is rarely resorted to in the system of taxation, and in this State is peculiarly the creation of the legislature, entirely independent of the Constitution or any of its provisions. In no sense can the provision of the Constitution be considered mandatory that such a tax (the one in question in this suit), should be laid or collected in order to perfect, and protect the right of suffrage.

This being so, the plaintiff will be compelled to take the anomalous position, that although this unusual tax exists only by legislative action, it would be unconstitutional for that body to repeal the law providing for its payment, because then all but property holders would be unable to meet the constitutional requirement to exercise the right of suffrage. But this tax, depending on legislative action alone for its existence, can undoubtedly be extinguished by it, showing, therefore, that the payment of such a tax is not secured as a constitutional right,—although if in existence and paid would bring the elector within the constitutional limitation, as indeed would the payment or any other county tax imposed by the same authority.

There can therefore be no implication of a prohibition in the Constitution upon the legislature's repealing a tax law, which it had full power to enact or to refrain from enacting.

A poll tax is not the only county tax, the payment of which

may qualify a voter.   The payment, directly or indirectly of a tax assessed on real estate or certain personal property is a qualification under the Constitution.

State v. Livingstone, 1 Houst. Crime Cases, 109.

The proposition to which we come therefore is, That the Constitution, in making the payment of a county tax one of the qualifications of a voter has referred to a condition collateral to, and " aliunde " of any constitutional provisions and one which must be controlled and can be changed or modified by the General Assembly as the sole depositary of all legislative power inherent in a sovereign people not denied or restricted by the Constitution of this State or of the United States.   Assuming therefore, that the matter of the assessment and collection of taxes is a matter of revenue— that there is no express constitutional provision for the payment of a poll tax, that the legislature having created that tax, has power to abolish it, and that the utmost duty of the legislature is to provide a county tax, and that the power of that body in the matter of taxation is supreme, it follows that any such regulation as is provided in the Act of Assembly in question although incidentally it may have the effect complained of, in this suit, is no violation of the fundamental law, and certainly not so palpable and flagnant as would warrant the Courts in pronouncing it unconstitutional.

Sharpless v. Phila., 9 Harris, 147 ; Huber v. Riley, 3 P. F. Smith, 315.

The Legislature through its agents the Levy Courts in each county, have exclusive and sole power over the tax assessments, and can prescribe what rules shall govern in their preparation.

Having the power to repeal the law relating to poll assessments in toto a fortiori, it is a proper exercise of the legislative function, to provide for the purging of the tax lists, of all that class of delinquents, who after full and public notice have failed to pay their taxes.   The provisions of the law in question are for the removal from the lists in question, of the whole of a certain class, whose right to pay such tax is not secured by any Constitutional

provision, and upon which the right of suffrage does not solely or necessarily depend.

As illustrative of (what is indeed undisputed) the right of the Legislature as expressed through the Levy Court, it may be mentioned, that this latter body has (by Act of Assembly) exercised unquestioned the right upon the return of a tax payer as delinquent, to direct his tax to be extinguished, although this action has the effect of preventing him from paying the tax for that year and thus reducing the Constitutional limitation.

Having this power over the collection or payment of a tax, *a fortiori* they would have it over the assessment.

The Constitutional qualification of an elector was not intended and did not in its terms contemplate an unchanged or unchangeable condition of laws, nor by any construction express or implied, does it impose a limit upon the essential powers of future legislatures to assess and levy taxes as exigencies might require, nor to regulate the amount and character and mode of collection of the same.

*Patterson v. Barlow*, 60 Penna. St., 81.

The legislature therefore having created a " poll " or personal tax, (for by no construction can it be derived from any Constitutional provision) must have the undoubted right to repeal it, (as we have already said) in toto; and having the legal right of regulating and prescribing rules for the assessment of taxables, it follows that the legislative action in reference to delinquent tax payers is within the purview of the sovereign power of that body, and infringes upon no Constitutional right of such delinquent.

The motives of the law making power cannot be brought in question nor the policy of the act impugned. It may be corrupt; in fact work injustice, and yet is not to be condemned on these grounds.

The Courts are judges and not law makers. The doubt as to the intention of the legislators, does not regard, nor can it be referred to the motives prompting the passage of an act; for over that the judges have no right of control.

*Sedwick Const. v. State Law,* 194; *Ex parte Newman,* 9 Cal., · 512; *Bradshaw v. City of Omaha,* 1 .Neb., 29.·

No inquiry upon the subject of the motives of the legislature can be allowed.

*Horpending v. Haight,* 39 Cal., 202; see also *Wright v. De-frees,* 8 Ind., 208; *McCullough v. State,* 11 Ind., 431; *State v. Hayes,* 49 Mo., 604.

The motive and intent are distinct. The intention is to be gathered from the words of the Act, and may properly be the sub-ject of construction by the Court, the motive of the lawmakers is not a proper subject of inquiry.

While it is considered, by the defendants that the act in ques-tion is a .proper and just exercise of the legislative discretion, in regard to the arrangement and procedure, for the assessment and collection of taxes, and that no criticism can be made upon it, upon the ground of its unreasonableness, or that it works any injustice, the above principles and authorities are presented to the Court, to sustain the position that the motives influencing its passage (should there be an attempt to impugn them) are not a proper subject of consideration.

In conclusion, the defendants recapitulate the following points :

1. That the Court will with great caution and reluctance de-cide that an Act of the Legislature is void, only doing so, when it is in flagrant and palpable repugnance to the fundamental law,— the motives of the Legislature not to be drawn in question.

2. That there is no provision of the Constitution requiring the levy and collection of the tax in question in this suit.

3. That the reference in the Constitution to the payment of a county tax, under certain conditions as a qualification to vote, is to a matter which has been left in the absence of Constitutional in-hibition or restriction, under the control of the Legislature, wherein all legislative power, not inhibited or restricted by the Constitution is reposed. So that in requiring the payment of a county tax, as . one qualification of a voter the Constitution prescribes a condition

that is collateral to and outside of an provision of itself, but is dependant for its existence and regulation, on the sovereign will of the people, acting through their Legislature, as established in their scheme of government.

4. That a poll tax is not the only tax the payment of which, will, under the Constitution, constitute a qualification for voting, and that such a tax as well as the whole matter of revenue and taxation, depends for its existence, upon the legislative will, and *a fortiori* is its modification, and regulation, as to assessment and collection within legislative control.

But aside from the question of the competence of the legislature, to regulate absolutely and exclusively the assessment and collection of county taxes, we maintain, that if this law is looked at merely as a law to regulate the right of suffrage, in other words, as a registration law, that it is not obnoxious, to fair and just criticism, because it is reasonable in its requirements, deprives no one of the right of qualifying as a voter, who uses ordinary diligence, and takes care that he is on the assessment lists, the ensuing year by paying the tax legallly assessed for the preceding year.

It is proper before closing this brief to call attention to the liability of the defendants in this case in any view of the law. If the law were unconstitutional the injury complained of was not worked by dropping the plaintiff from the assessment list but by the refusal of the assessor to assess him, for a period twelve months thereafter.

Acting under the existing laws the defendants are protected.

*McCrary on Elections*, Chap. 8, Sec. 254; *People v. Solomon*, Am. Law Reg. vol. 9, 232; *State v. Carroll*, Amer. Law Reg. vol. 12 N. S., 165 and 179.

COMEGYS, C. J.   The questions presented in the arguments of this case by the counsel of the plaintiff are many; but they are all within the scope of those made by the case stated, and questions reserved thereon, which, in effect, are whether the legislation of

this state in 1873, set forth in counsel's briefs, is a valid exercise of legislative power; and, if not, whether the defendants are liable to the plaintiff in damages in his action.

In order to properly comprehend and decide the first question, it is necessary—at least I think it will be useful—to go back into the political history of the state, or rather of the territory of which it is composed, and ascertain what, down to the time of the Revolutionary War, was the law with regard to the suffrage, or right to vote for public officers at elections. Before doing this, it will be well that a proper understanding should obtain in regard to the participation of men in the government they are under; that is, the power of deciding by ballot, at elections held for that purpose, who shall administer public affairs.

It is not directly denied on behalf of the plaintiff—in fact, it is conceded—that the power to use the ballot is one of those derived from government, or the political society in which the elector resides. At the same time the contention here is the outgrowth of the idea that the primary object of government is universality of electorate. It is, of course, entirely consistent with the hopes of most men, members of a political body, (as one of the states of the Union,) that every person recognized by society as acting *sui juris* should participate in the ballot; and all such, it is believed, are accorded that privilege. But in this state, as no doubt in most of the others, it is conferred only upon the condition of contributing to the support of the government. The paramount duty of organized society is not to make the use of the ballot " free " to every such person, but to provide the means for its own sustenance, which is done by taxation, and, after that, but altogether subordinate to it, however, to secure to the payer of taxes, not the mere taxable, the privilege, or " right," as it is generally called, to vote at elections. There is no natural right to vote. It is one conferred by a community at large upon certain of its members, which implies the power and authority to withhold it from others. The whole idea of our original government—that before 1776—was that only those

who paid taxes should vote; not that all should vote, but only those who helped to support the government. It was a privilege conferred upon such, and such only. They were the freemen, out of whose body, in the public aggregate mass, the public officers, particularly the legislative council and assembly, were to be chosen. Those who had real estate were rated upon it, and such as had not were assessed upon the poll.

It is a great mistake to suppose that the first law for a poll-tax, as alleged by plaintiff's counsel in argument, was the act of 1796. The fact is that before William Penn came to America, to take possession of the territory granted him by Charles II, (March, 1681,) he promulgated a "frame" of government for his province of Pennsylvania, and a Code called "Laws Agreed upon in England," which latter defines those who are to be considered as freemen to use the ballot. In the language of the "frame," by the second clause or paragraph, the freemen were to choose the provincial council, and, by the fourteenth, the members of the general assembly. There is, however, no definition therein of a "freeman." The date of this is the 25th of April, (then the second month,) 1682. On the following 5th of May, the latter rescript was passed, which in the second clause defines the term "freeman," used in the former and in the first clause of the latter, in the following words: "Second. That every inhabitant of said province [Pennsylvania] that is or shall be a purchaser of one hundred acres of land, or upwards, his heirs and assigns, and every person who shall have paid his passage, and taken up one hundred acres of land at one penny an acre, and have cultivated ten acres thereof, and every person that hath been a servant or bondsman, and is free by his service, that shall have taken up fifty acres of land, and cultivated twenty thereof, and every inhabitant, artificer, or other resident in the said province that pays scot and lot to the government, shall be deemed and accounted a freeman of said province; and every such person shall be, and may be, capable of electing, or being elected, representatives of the people in provincial council or general assembly

in the said province." These documents are to be found in a compilation of the laws established by the Duke of York, and by the Penn government, also, made by authority of the state of Pennsylvania, labeled "Duke of York's Book of Laws, 1676-1682" and the "Charter and Laws of the Province of Pennsylvania, 1683-1700," pp. 93-101.

In the "act of union" by which the counties which now form this state were, by the desire of the inhabitants, annexed by Penn (who had become enfeoffed of them by deed of the Duke of York, who succeeded his brother, Charles II., as James II.) to his province of Pennsylvania, those inhabitants were guaranteed to be governed by the same laws, and to enjoy the same privileges, in all respects, as the inhabitants of Pennsylvania, etc. Freemen in the counties were then the same as freemen in the province; that is, those who paid "scot and lot," or "customary contribution laid upon all subjects according to their ability," as it is defined by the lexicographer, Bailey. The date is 7th of December, 1682. Id. 104. On the same date as the "act of union," Penn, "with the advice and consent of the deputies of the freemen of this province and counties aforesaid," (the Delaware counties,) enacted what is called "The Great Laws, or Body of Laws," by chapter 58 of which it is provided as follows: "And, that elections may not be corruptly managed, upon which the present and future good of the province so much depends, be it," etc., "that all elections of members or representatives of the people and freemen of the province of Pennsylvania, and territories annexed, [now Delaware,] to serve in the assembly thereof, shall be free and voluntary; and that the elector that shall receive any reward or gift, in meat, drink, moneys, or otherwise, shall forfeit his right to elect; and such person as shall give, promise, or bestow any such reward, as aforesaid, to be elected, shall forfeit his election, and be thereby incapable to serve as aforesaid; and the assembly shall be sole judges of the regularity or irregularity of the election of the members thereof."

In chapter 127 following, it is enacted in these words: "And,

to the end that due provisions be made to defray the requisite charges incident to the public business and service of this province, and territories thereof, be it enacted," etc., "that the charges of each county shall be made up in open court by the respective magistrates thereof; and that every such court shall have, and hereby hath, power to assess and lay such taxes upon the county as shall defray the same, so that it be equal, and according to proportion; and that the one-half of the said tax to be paid shall be raised upon land, the other half by the poll, on the male from sixteen to sixty years of age, and that all such persons who hold land within the province and territories thereof, and do not reside therein, and so incapable of giving that attendance, and yielding that service, to the public, as those that live therein, shall pay to all public taxes for such lands so held by them one-half more than residents pay for the same portion."

On the 20th of October, 1691, William and Mary took the government of the province and territories (the Delaware counties) into their own hands. In this state, on dispossession of Penn, they appointed, as captain general and governor, Benjamin Fletcher; one of the first acts of whose administration was to procure the passage of a law for granting a penny in the pound to the sovereigns, towards the support of the government under him. The fourth clause of the act provides that the tax shall be a charge upon real and personal estate for a year only, and then declares that "all freemen within this province and territories as have been out of their servitude by the space of six months, and shall not be otherwise rated by this act, nor worth one hundred pounds, shall pay unto the use aforesaid the sum of six shillings per head, with a proviso that our chief proprietary and his late deputies shall not be assessed or otherwise chargeable by virtue of this act." Id. 221, 222. By section 17 of this act, (the law about counties levies,) it is provided that the grand jury shall present any sum necessary to be raised, either for the paying of any public debt, or other occasion for the public utility of the county, "and the justices [of the

quarter sessions] to make the rate or assessment, which shall be raised in the same manner as moneys are by the sessions agreed to be raised for the support of the government, viz., after the rate of one penny per pound [upon property] and six shillings upon the poll." Id. 233.

William Penn was restored to the government of his province and territories by William and Mary in the sixth year of their reign, (21st October, 1693,) and appointed his nephew, William Markham, his deputy, who, with the advice and consent of the council and representatives of the province and territories, passed an act or body of laws, the first clause of which, after the preamble defines the term "freemen," (that is, those who were to vote for council and assemblymen,) as follows: "That no inhabitant of this province or territories shall have right of electing or being elected as aforesaid unless they be free denizens of this government, and are of the age of twenty-one years of age or upwards, and have fifty acres of land, ten acres whereof are seated and cleared, or be otherwise worth fifty pounds lawful money of this government, clear estate, and have resident within this government for the space of two years next before such election." Id., 247. By this law, Penn made the electoral qualification one entirely of property. In the second chapter of the enactment is "An act for raising the rate of one penny per pound, and six shillings per head, upon such as are not otherwise rated thereby, to be employed by the government for the time being as is hereinafter limited and appointed;" the enacting section of which fixes the rate for housekeepers, and then provides that all males within this province and territories of this act who have been free of their servitude by the space of six months, and shall be above the age of 21 years, being worth £72 and upwards, shall be assessed and pay after the rate of 1 penny per pound clear estate as aforesaid, and that such of the said males only as be not worth £72 shall pay six shillings per head. In 1704 the separation between the territories and the province took place; and thereafter they had separate legislative bodies, though under

the lieutenant governors of the Penn proprietorship of the province as long as the rule of the family lasted, that is, down to the Revolutionary War. The first declaration of those entitled to vote, of electing and being elected, after the separation was made by an act of the 7th George II., (1736,) passed by the then Lieut. Gov. Patrick Gordon, " by and with the advice and consent of the representatives of the freemen of the said counties, [New Castle, Kent and Sussex on Delaware,] in general assembly met," etc., which in its second section confines the suffrage to property holders by this language : " Provided, always, that no inhabitants of this government shall have right of electing or being elected as aforesaid unless he or they be natural born subjects of Great Britain, or be naturalized in England, or in this government, or in the province of Pennsylvania, and unless such person or persons be of the age of twenty-two years or upwards, and be a freeholder or freeholders in this government, and have fifty acres of land or more well settled, and twelve acres thereof cleared and improved, or be otherwise worth forty pounds lawful money of this government clear estate, and have been resident therein for the space of two years before such election." 1 Laws Del., 146.

There is no other act relating to the qualification of elector in the colonial period. In the year 1797 an act of the general assembly of the state was passed which established a different rule from that then prevailing for assessing the polls of freemen, that is, the personal rate. This fixed it at not more than £1,000 of the then currency, nor less than £200. This is the act erroneously supposed to have first created the poll-tax. Hall's Dig.' Laws Del., 390· In the revision of 1852 the phraseology is changed, the highest rate of poll tax being $2,700, the equivalent of £1,000, and the lowest $140, the virtual equivalent of £50, Delaware currency. Such is the law of the state at this day.

From this review of the law which has always prevailed here in regard to the qualification of voters, two things seem to be clear, —that is, that the right to vote was conditional altogether upon the

payment of taxes previously assessed, ("scot and lot," as tersely expressed in the homely but perfectly well understood language of the ancient enactments,) and that the poll-tax was adopted 100 years, at least, before 1797, for those who had no property. Under the old system, there could be no privilege of voting by any without payment of tax, without each man paying his part towards the support of government. The theory then was that no man should enjoy the privilege of voting for public officers unless he paid for it, by adding the requirement of tax upon him to the general concession for the maintenance of the state. The privilege was conditional upon his doing that in some form, voluntary or by compulsion. "Pay your tax, and you may vote," said the law; which shows that it was only upon compliance with a condition that a citizen could cast a ballot. All arguments, therefore, which are the offspring of any notion of inalienable right, sacred right, indefeasible right, have no place in this discussion. The right to vote was, in the old time as now, conditional upon several things,—citizenship, majority of age, payment of county rates and levies. It was and is but a privilege or right *sub conditione;* and those who fixed the terms of it were strangers to any other idea than *quid pro quo,*—"scot and lot." Such modern ideas as manhood suffrage, (if by that be meant a suffrage because of full age,) ballot for all, and slavery without the ballot, were properly left to be evolved out of the consciousness of visionary theorists, with aspirations for a state of society dreamt of only by those who would substitute our poor humanity for the great creator.

The law of 7th George II., (1736,) continued, as that fixing the qualification of voters, until the constitution of the state, of 1792, was made; for that of the 20th September, 1776, (1 Laws Del. App., 83,) expressly provides that "the right of suffrage in the election of members of both houses shall remain as exercised by law at present;" etc. Article 5. In the former the right is thus defined. Article 4, § 1: " All elections of governor, senators and representatives shall be by ballot; and, in such elections, every

5

white freeman of the age of twenty-one years, having resided in the state two years next before the election, and within that time paid a state or county tax, which shall have been assessed at least six months before the election, shall enjoy the right of an elector, and the sons of persons so qualified shall, between the ages of twenty-one and twenty-two years, be entitled to vote, although they shall not have paid taxes." Const, 1792, (1 Laws Del., 38.) The latter clause of the article was a new feature introduced into the canon of electoral qualification. In the year 1831 a state convention was held to revise the constitution of 1792. By it, elections were made biennial instead of annual, and the electoral qualification was modified by this language: " In such elections every free white male citizen of the age of twenty-two years or upwards, having resided in the state one year next before the election, and the last month thereof in the county where he offers to vote, and having, within two years next before the election, paid a county tax which shall have been assessed at least six months before the election, shall enjoy the right of an elector; and every free white male citizen of the age of twenty-one years and under the age of twenty-two years, having resided as aforesaid, shall be entitled to vote without payment of any tax: provided, that    *    *    * no idiot or insane person or pauper, or person convicted of a crime deemed by law a felony, shall enjoy the right of an elector," etc. Rev. Code 1874, pp. xxxii., xxxiii. This change extended the time for payment of tax to two years before the election, to conform it to the biennial system of elections; allowing all men between 21 and 22, having the residential qualification, to vote without payment of tax, confined the tax to county rates, and excluded the insane, paupers, and persons convicted of felony. This constitutional qualification continues in force to this day,—nearly 60 years from the time of its enactment. Under the old system of taxation provided in the sixth section of the " act concerning the levy court," etc., (Hall's Dig., 576,) the general rate of persons and personal property continued for 6, and the assessment of real estate for 12

years.   Afterwards the former was reduced to 4 years, (Rev. Code 1874, p. 85,) and by a subsequent amendment, that of real estate, which before had been first 12 and then 8 years, was reduced to 4, also, (13 Laws, c. 294;) so that the assessments of persons and personal property and real estate, are now uniform as to duration.

By the law in force prior to the year 1843, upon the allowance by the levy court to a collector, in its settlement with him at the March session, of a party upon his duplicate as a delinquent, the practice was to drop his name from the assessment list; and it remained off until the next general assessment of persons and personal property, when it was restored.   This was in virtue of the rule that a condition once shown to exist is presumed to continue until the contrary be established.   If the statute had not provided that there should be a general assessment of persons and personal property, (quoad ante,) the name would have remained off the list until the delinquent had himself applied to have it restored, which would not, of course, have been done without some proof that the condition no longer existed; and, in accordance with this presumption, a collector was allowed two years to collect the taxes on his duplicate, (copy of the assessment list, with calculation of tax,) and no more.   Then the tax was treated as extinguished entirely. Hall, Dig., 380.   But it was discovered that collectors, in their zeal to promote the interest of the political party to which they owed their appointment, were in the habit, after the expiry of the two years, of allowing the taxes more than two years old of delinquents on their own sides, or on any other side, provided they would vote the ticket of the collector's party, to be paid, with a view of qualifying them to vote.   As the collector's receipt was evidence of right to vote, there was no gainsaying it, without resort to the records of the levy court, which was impracticable.   To prevent this fraud upon the election law, which contemplated, not the payment of taxes allowed as delinquent, and thus extinguished in fact, but payment of existing rates, the legislature, at the session of 1843, passed an act entitled " An act to amend the election laws

of the State of Delaware," in the following words, (Act 9th, vol. 545 :) "Whereas, it is highly important to preserve the elections in their purity, and to secure the confidence of the people in the integrity of those who conduct them, therefore,   *   *   * Sec. 2. And be it further enacted by the authority aforesaid, that, for the purpose of preventing frauds by the pretended receipt of old taxes, and by the antedating of receipts for tax, that no collector in this state shall collect any tax upon his duplicate after two years from the date of his waraant, but that after the lapse of two years from such date every such tax shall be extinguished, and no collector shall have power to give a receipt therefor. And it is hereby further enacted and declared, that every tax which shall have been returned and regularly allowed by the levy court as delinquent shall be, and the same is, utterly extinguished, and no collector, or other person in his name, shall have power to collect the same, or give a receipt therefor, and any receipt given for such tax shall be void; and if any collector shall receive any such tax, or give a receipt therefor, contrary to the provisions of this section, or shall fraudulently antedate or post-date any tax receipt, or shall use any other fraud in giving such receipt, he shall be deemed guilty of a misdemeanor, and, on conviction thereof by indictment, shall forfeit and pay to the state a fine of one hundred dollars, and shall also forfeit and pay to any person who will sue for and recover the same the further sum of one hundred dollars, with costs of suit. The levy court shall examine and settle the delinquent lists of each collector at its meeting in March every year, and make allowance of delinquents. Upon the allowance of any delinquency, the name of such delinquent shall be struck from the assessment list, and also from the collector's duplicate, and shall not be again restored until the delinquent is again lawfully assessed. Sec. 3. And be it further enacted by the authority aforesaid, that the assessors for each hundred in this state, in the year eighteen hundred and forty-four, and in every year thereafter, shall make and complete the assessment for their respective hundreds by the fifteenth

day of January, and shall, on or before the twenty-third day of said month, publish, by posting in at least five of the most public places in such hundred, a list of the names of the persons assessed, arranged in alphabetical order, setting down separately the amounts assessed as real, personal, and capitation, or poll, tax, and carrying out the aggregate amount so assessed against each name, and shall at the same time, and at the same places, and in the same manner, give notice that they will attend at the place of holding the general election in such hundred on the last Saturday in said month, from the hour of ten o'clock a. m. until the hour of five o'clock p. m., for the purpose of correcting any errors which may then be shown to him by any resident of such hundred in his assessment, and for the purpose of assessing any such resident as he may have omitted. And additions to, and corrections of, the said assessment lists, may also be made by the levy court and court of appeal in session at any stated or regularly adjourned session of the said court before the first day of April in any year. No assessment shall be made after the last day of March, nor shall any alteration of the assessments be made after that time, except in the lawful allowance of delinquencies. If any assessor, collector, clerk of the peace, or other person, shall fraudulently add to, or take from, the said assessments, as finally settled by the levy court at its last session in March, such person shall be guilty of a misdemeanor, and, on conviction thereof by indictment, shall forfeit and pay to the state a fine of five hundred dollars.     *     *     * "

The preambles to the first and second sections show the motive and purpose of the legislature; the latter being that above ascribed to it. As corroborative of the allegation above made, that the payment of existing rates by a party offering to vote was contemplated, it is only necessary to refer back to the statute already cited from Hall's Dig., 573, where, near the close of the fourth section, will be found this language in relation to the returns of the assessors of the assessments, correction of them by the court, etc.: " And, in the year in which a general rate of persons and valuation of per-

sonal property only shall be returned, the list [assessment list] shall contain the names, in alphabetical order, of all the persons upon the assessment list of the hundred whose personal property shall be valued, or personal rate imposed; and such list shall specify the personal rate, and the number of slaves, and their valuation, and the valuation of the personal property, and the total amount of the rate and valuation, and in all other years [i. e., years other than those of general assessment of persons and personal property, then six years apart] the list shall contain only additions or alterations that shall have been made to or of the assessment list of the hundred," etc. By the sixth section of the same act it is provided " that the assessor of each hundred shall annually rate the persons of those liable to such rate, who have arrived to the age of twenty-one years since the making of the assessment of the preceding year, or who shall come to reside in the county, or who shall before have been omitted, and personal property acquired by bequest," etc. Here there is no provision for the restoration of delinquents to the assessment list. Having been dropped from the general list by the uniform usage of the levy court, by force of the presumption quoted, they were not to be again rated until a new general assessment was made. The legality of the practice was unquestioned. The objection to one offering to vote, that he was not on the " levy list " as it was called in common speech, was fatal to his application, unless he could show, before the constitution of 1831, the payment of a state or county tax within a year which had been assessed six months before the election at which he offered to vote, or, since that time, the payment within two years of a county tax assessed six months also before the election. The purpose of the act of 1843 was to expressly require what had been always theretofore held to be the law with respect to delinquents, with that, in addition, of preventing the pretended receipt of old taxes, etc. The theory had always been, without dispute, to that time, by the men of any party, that delinquency was exclusion from the assessment until another general assessment of persons and personal

property was made, when the law required that they should be put on the list again.

The act of 1843 stood unchallenged upon the statute-book until the year 1847, when a supplement to it was passed, the second section of which provides as follow: "That it shall be the duty of each of the assessors of this state, in the annual assessments for their respective hundreds, according to the law of this state, to assess all such persons as may have been returned and allowed as delinquents at any session of the levy court preceding the period fixed by the act to which this is a supplement, for the completion of his assessment: provided, such persons reside at the time in the hundred for which he is assessor. And any resolution or order of the levy court, in either of the counties of this state, adverse to the provisions of this act, be, and the same is hereby, declared null and void; and any practice authorizing the said assessors to omit the assessment of such delinquents until the period of the assessment of persons and personal property next following the time when such persons shall have been allowed as delinquents be, and the same is hereby, directed to be discontinued." Volume 10, p. 171. Though not doing so in terms, this act virtually repealed that portion of the original act of 1843 which provided differently with respect to delinquents; but there is no suggestion or hint in it that the repealed feature of the latter act was in any sense hostile to the constitutional provisions concerning the privilege of suffrage. It therefore should be treated rather in the light of a revenue provision. At the session of 1851 an act was passed entitled "An act to extend the rights and privileges of poor white taxables within the state." It is in the following words, (Act 10, vol. 518 :) "Whereas, the present law of this state, requiring the names of delinquent taxables to be stricken from the assessment lists, does, in substance, treat poverty as a crime amounting to disfranchisement; and whereas, it may, and frequently does, happen that, from sickness or other misfortune, poor persons become temporarily unable to pay the public taxes assessed against them, who are

nevertheless good and worthy citizens, and willing at all times, when able, to pay the public charges against them, and that the inability to pay in any particular year is no proof that such inability will exist the succeeding year; therefore: Section 1. Be it enacted by the senate and house of representatives of the state of Delaware, in general assembly met, that from and after the passage of this act the allowances of delinquent lists in the several counties of this state shall be deemed, taken, and held to have no other design or effect than the crediting of the accounts of the several collectors for the time being with the several amounts by them respectively returned as the assessments against said delinquent taxables, and that, after being so allowed and credited as aforesaid, the same shall all be again placed on the duplicates of the collectors of the several counties for the succeeding year, except such as are returned as being dead or removed from the state. Sec. 2. And be it further enacted that the act entitled ' A supplement to the act entitled " An act to amend the election laws of the state of Delaware," passed at Dover, February 16, 1847, and so much of the second section of the act entitled ' An act to amend the election laws of this state,' passed at Dover, February 27, 1843, as relates to the striking the names of delinquent taxables from the assessment lists and the collectors' duplicates, be, and the same are hereby, repealed, made null and void." This act had its inspiration in the desire of the political party which at the preceding general election of representatives, etc., had attained the power through a split in the party dominant since 1828, to increase its voting strength; the delinquent taxables having been always chiefly of their politics. It was not the offspring of any sentiment that prior legislation with respect to delinquents was in derogation of the electoral right, but grew out of the natural wish to magnify the electorate so as to enable the party then in power to remain there. It is true, the preamble has language that would warrant a different view; but it is well known that it was used simply rhetorically, to promote the passage of the act. If any of the tax laws had been suspected even of infringing

the constitutional right of suffrage, the party which passed the acts now under consideration would have brought them to the bar of judicial decision to be annulled; for their interest, for the reason above given, made them necessarily hostile to them. The law just quoted remained undisturbed until the legislation of 1873, which gave rise to this controversy. That legislation has provoked much criticism and animadversion; yet it is not much more, so far as delinquent taxables are concerned, than a revival of the act of 1843, prepared by the then attorney general of the state, the late Chief Justice Gilpin. From the known care and caution with which his legal action generally was characterized, it is fair to suppose that he gave to the preparation all the consideration and reflection the subject required. Although the fact would not of itself justify a positive conclusion as to the validity of the law; yet it is much, in passing upon it, constitutionally considered, to know that the then first law-officer of the state put it forth with the sanction of his professional rank. As the present assessment laws are part of the legislation of 1873, it will be well to take a view of the law as it was before that session. There being no other law for the registration of voters than the assessment laws, this is the more necessary; the real contention being that the system of law under which we live, with respect to the electoral right, is repugnant to the constitution of the state, or that of the United States.

I have already pointed out that in this state there are periodic general assessments of persons and personal property, as well as of real estate. Now they are, by modification of former law, to be made every four years; and now, as heretofore, annual assessments of persons and personal property, in addition to the general assessment, are to be made, for the purpose of including new-comers, persons who have arrived at age since the prior assessment, and personal property since acquired, and to correct omissions, etc. The "Act for the valuation of property" (Rev. Code, 84) provides for the periodic assessment of property and persons, but it was modified by chapter 394 of volume 13 so as to reduce the time for the

duration of the assessment of real property to four years; thus se-
curing a general assessment of all property once every four years.
I have stated this before.   There was also, by this act, a provision
for annual assessments, as above.   There was no change in these
provisions made by the act of 9th of April, 1873, —part of the
legislation under consideration ; but some new features were intro-
duced for what would seem to be the purpose of securing to per-
sons who ought to have the right to vote the means of perfecting
that right, and to prevent others from voting who ought not to be
allowed to do so.   The first section prevents the assessors from plac-
ing upon the assessment list, in addition to the names of those as-
sessed for poll·tax, (all male citizens entitled to vote,) the name of
any one not the owner in his own right of taxable property within
the assessor's limits, unless he be satisfied, from personal knowledge
that he is of age, and a *bona fide* resident of the hundred or dis-
trict, except as thereinafter in the act provided.   The second sec-
tion provides that, in 10 days after making his assessment,—which,
by section 16 the chapter concerning assessors, (Rev. Code, 78,) he
is to complete by the 1st day of January,—he is to post it, made
alphabetically, in front of the most public places in his territory,
and give notice in writing, either attached to it or otherwise, stat-
ing that he will attend at the place of holding the general election
therein, on some day to be named in said notice, from 10 a. m. till
5 p. m., to correct errors, and assess any who may have been
omitted ; and shall also state in the notice that persons desiring to
be assessed must apply in person at the time and place mentioned
therein, and furnish proof of identity, age, and residence required
by section 3 following.  And it is provided in the same section that,
if the assessor cannot complete the services on the day named, he
may adjourn to the next or some subsequent day, not exceeding
three days from that time, to be announced publicly to those pres-
ent at the time of the adjournment.   The third section not only
makes it lawful but the duty of the assessor to place upon his as-
sessment list the name of any person who may have been omitted,

who shall appear before him at the time and place specified in the notices aforesaid, and prove his right to be assessed by the affidavit of some respectable freeholder of the county, according to the form of the affidavit given. The fourth section enacts a penalty against the assessor, of not less than $100, nor more than $500, to be recovered by indictment for the misdemeanor the offense is declared to be, of refusing or omitting to place the applicant making the aforesaid proof upon the assessment list, and also for placing on the list, knowingly, the name of any fictitious person, or person not at the time a resident of his territory. The fifth section provides that, in case the assessor is unable, from sickness or otherwise, to attend at the time and place stated in his notice, he shall appoint some other man for the purpose, and give notice thereof at in the second section is mentioned. The sixth section makes it unlawful for the levy court, or any member thereof, to take from the assessment list any names appearing thereon, or to add to any assessment returned by the assessor the name of any person, unless upon his personal application and proof so to be made, as aforesaid, before the assessor, of his right to be assessed. A violation of the above by a member of the court is made a misdemeanor, with penalty of a fine of from one to five hundred dollars on conviction. And, if the clerk of the peace (the clerk of the levy court) shall neglect to place upon the duplicate to be delivered by him to the collector any name on the assessor's list, he shall forfeit and pay to the person whose name is left off the sum of $10. This is to punish him ; for the party's right to vote depends upon his assessment, and not on the correcting of the duplicate. The seventh section makes the offense a misdemeanor, punishable by fine of from one to five hundred dollars, by any one who shall procure or cause to be placed upon the assessment list any person not entitled to be assessed, or any fictitious or fraudulent person. The eighth section makes it perjury to make a false affidavit under the act. The ninth section makes it unlawful for any assessor or the levy court to place upon the assessment list of the assessor's hundred the name of any person who was returned

a delinquent the year preceding, until after the expiration of 12 months from the time of the allowance of the delinquency by the levy court. The tenth section makes it the duty of the clerk of the peace to deliver to the sheriff in the month of August, in the year of holding the general election, an alphabetical list for each of the hundreds of the county of the delinquent list made and returned by the collectors at the March session of the levy court.

By the tenth section of the chapter next succeeding, (chapter 12, of "Collectors,") each collector must, on the first Tuesday of March next succeeding the date of his warrant, render to the levy court a true account of all taxes it was his duty to collect, of all payments made, and of all delinquents; and by section 1 of chapter 372 of volume 14 of the Laws, (Rev. Code, 90,) it is made the collector's duty, within 30 days after he has received his duplicate, to give public notice by advertisements, posted in 10 or more of the most public places of his territory, stating his place of business or residence, and his readiness to receive taxes; and it is also made his duty, in the month of January in each year, again to give public notice, as aforesaid, of at least 10 days, said notice to state the times and places at which he will attend to receive unpaid taxes. It is then made the duty of the levy court, upon proof by the collector's affidavit filed in the office of the clerk of the peace, setting forth that he gave the notice required, and that, in accordance with the last required notice, he did attend at the time and place designated, and there remained for the space of 5 hours each day, for the period of at least 3 days, for the purpose of collecting the taxes aforesaid, to allow him as delinquencies the uncollected taxes; and then declares that the names of the delinquents shall be dropped from the assessment list by the levy court, and not be placed thereon again for the period of 12 months from the date of the allowance. The section is made applicable to persons liable to pay poll-tax alone; for the reason that those owning real property can always be made to pay by sale of their property, taxes being a prior lien thereon. It is true there is the ultimate remedy by im-

prisonment of the body in the case of mere poll-tax men; but it is never resorted to, the cost to the county of confinement in jail for a week, even, more than exceeding the tax. The second section provides that the notice shall be a sufficient demand upon taxables for their taxes, and a performance of the duty to make demand. By the law before, (sections 13, 15, c. 12, Rev. Code, aforesaid,) collectors could only proceed to sell property or imprison the body after 10 days' demand, to be proved by his oath as competent evidence of that fact. By section 17, c. 10, Rev. Code, p. 81, every assessor is required to return his assessment—which by the sixteenth section he is required to complete by the 1st day of January—to the levy court on the first Tuesday of February, and to attend the court on that day, and on the first Tuesday of March, and on such other days as the court may require, under a penalty of $20 to be recovered by indictment. This is to enable the court to perform its duty, mentioned in sections 12 and 13 in the chapter next cited. By section 11, c. 8, Rev. Code, p. 62, the levy court is required to sit as a court of appeals on the first Tuesday of March of each year, and on such days and times thence next in said month ensuing as it shall be necessary to adjourn to, and examine the assessments returned by the assessors, and the corrections thereof and additions thereto that may have been made, and receive, hear, and determine appeals against the same. By the twelfth section the court have power, either upon their own examination or upon appeal, to make additions to and corrections of the assessment list; to call before them any person whose name ought to be on it, or who was omitted by the assessor, etc. By the fourteenth section, an assessment cannot be called in question anywhere than in the levy court; and the same, as it shall stand in that court, is conclusive. The fifteenth section provides that no assessment shall be made after the last day of March; and the sixteenth section, that, if any person shall fraudulently add to or take from the assessments as finally settled by the levy court, he shall be guilty of a misdemeanor, and fined $500. The twenty-first section enacts that, at

the meeting in March in every year, the court shall settle the delinquent list of each collector, and make allowance of delinquents, and upon such allowance the collector is to be credited with the amount thereof. Then there is the provision for the reassessment of the delinquent, superseded by the legislation of 1873.

I think I have now given—in brief in most cases, but in some *verbatim et literatim*—the provisions of law now in force in relation to the assessment and collection of taxes, and the allowance of delinquents, and the requirement when this is to be done. It will now be useful to compare the old with the present legislation, with a view of seeing what is the difference between them,—whether that difference does deprive the citizen of the right or privilege of suffrage; it being contended by the plaintiff's counsel, not only that the new legislation was designed to disfranchise a certain class of voters, but that such is the necessary effect. Leaving out of view the question of design, which has no place in this discussion, the point to be decided is, does the legislation of 1873 necessarily impair the voting right of the citizen? It will be well, in this inquiry, to look at the state of things existing at the time it was passed, as contrasted with that it displaced.

Before emancipation of slaves, and the adoption of the fifteenth amendment to the constitution of the United States, voting in Delaware was confined to white males of over 21 years, with the exceptions before given; and so steady and constant was our population everywhere, except in Wilmington, that such persons as were selected to be assessors were usually acquainted personally with nearly all the voting class. It was for this reason, no doubt, that the law made no requirement of notice by the assessors that they were about to proceed, or would proceed, to make the assessment. At the February session of the levy court, the assessments were returnable; and, by the practice of the court and the law, they were liable to correction by the levy court, in order to perfect them. But the March term was an appeal term from assessments, at which any person aggrieved at not being assessed at all, or who, or whose

property, was unfairly assessed, could appear before the court, and obtain redress. When the levy court had made an examination of the assessment list, and corrections in them, at the February term, it was the duty of the clerk of the peace, by the 20th of the month, to make copies of the hundred lists, and post them for public inspection, with notice of the holding the court of appeal. Section ·27, c. 9, Rev. Code, (Hall's Dig., 375.) This publication was the first formal notice to the public of the assessments, and then they had been completed by the assessors. No further notice was given in relation to assessments. On or before the first Tuesday of April following, it was the duty of the court to issue to the collectors duplicates of the assessment lists, with the taxes assessed upon them, together with warrants for their collection; and it was that of the collector, before proceeding to collect his taxes by legal process, to make 10 days' previous demand for them. But other notice to the tax-payers there was none. Doubtless it happened, in many cases, that parties were returned delinquent who had never been called upon for their taxes at all; their only notice being that given by the clerk of the peace, as above required, in the publication of the assessment lists. I have already pointed out that, under the old system, prior to the act of 1843, when a person was returned a delinquent, his name was dropped from the assessment then existing, and have ascribed the practice to the maxim specified. Under it, therefore, if he was returned a delinquent, and allowed as such by the levy court at the March session next after the year when the assessment was returned, he was off during the residue of the duration of the assessment, (then six years,) and, after it was changed, then the residue of four years. But it was found that many names were restored in some way surreptitiously, which operated to allow the delinquent class, or such of them as the dominant party needed in their service, to vote when their ballots were in requisition, and escaped paying their taxes at other times; thus defeating the requirement of paying " scot and lot," or taxes whenever assessed, as the distinction of a freeman. This law of 1843 broke up that

fraud, or was intended to do so, and required, in terms, that the delinquent's name should not only be dropped, but that it should not go upon the list again until he was again lawfully assessed, which, by the restrictive effect of the provision in the old statute for annual assessments, could not be done until there was a general assessment of persons. In 1847 an act was passed, the second section requiring the reassessment of delinquents in the annual assessments. They then were made to stand upon the same footing as persons before omitted. The first section required the delinquent list to be returned by the collectors on the first day of the annual March term, and prohibited allowance of it by the levy court for five days after return, and secured the public right to inspect it, by indictment of the members of the levy court, or the clerk of the peace, as the case might be, refusing to allow such inspection upon application. Volume 10, p. 171. That act was repealed by that of 1851, before quoted, which provided that the effect of allowance of delinquency should only be to credit the collector with the tax, and required that the name of the delinquent should be again put upon the collector's duplicate. It also repealed expressly so much of the act of 1843 as required the dropping the name of a delinquent from the assessment list, though that was done by implication. The act of 1843, by the expression of purpose contained in the second section, shows a motive for passing the provision with respect to delinquent taxes, and to dropping delinquents from the tax-list. It did its work very effectively, so that taxes had to be paid. The condition upon which the elective franchise was to be enjoyed had to be performed, for the legal presumption prevailed.

In the political campaign of 1846 when the dominant party lost their candidate for governor, a fierce assault was made upon it, and chiefly because of the act of 1843, and the manner in which that law dealt with delinquents. The legislature, however, was not lost; and accordingly, at the session following the election, the act of 1847 was passed, which was repealed, as has been stated, by that

of 1851, when the power of the party in the legislature passed into the hands of its opponent. The legislation upon the subject of delinquents was a game of politics, but no one doubted that it was one which might be lawfully played. It did not put it out of the power of any man, really or practically, to obtain and retain the right to vote, but only aimed at compelling him to perform the condition for its exercise as other people had to do who owned property,—pay the county taxes.

The party which passed the act of 1851 lost its ascendency in the legislature at the election of 1852, but retained its majority in the senate. Of course, there was no prospect of repealing that which had been so great a *desideratum* with it,—on whose side the great body of the delinquents was. At the election of 1854, a totally new party came into power, and by what was then a large majority. Both branches of the legislature were of its members, —the house entirely, and two-thirds of the senate. It was a very strong party, and had no need to concern itself with legislation about delinquents. A great mistake of legislation made at that session so shattered its ranks that the political power of the state passed away from it utterly, and the party itself practically disbanded. Such result restored to power the makers of the legislation of 1851, which, suiting the dominant party perfectly, remained in force until it was repealed by that of 1873. By the latter, the provision contained in the law of 1843 for dropping the name of a delinquent from the list, was re-enacted; and by the assessment act, (14 Laws Del., c. 371, Rev. Code, p. 82,) passed at the same session, (on the day preceding the delinquent act,) or 14 Laws Del., c. 372, Rev. Code, p. 90, assessors were forbidden to assess a delinquent " until after the expiration of twelve months " from the time allowance as delinquent was made by the levy court. Why was the act of 1843 practically revived, as to dropping delinquents from the assessment list? That question has been answered before by what was said with respect to the necessity claimed for the legislation of the 9th of February, 1873. An immense number of

6

voters, and many of them emigrants from the south, had been added, by the fifteenth amendment to the constitution of the United States, to the political ranks of the state.    Almost all of these new voters were obscure persons, without any means whatever of a tangible nature to pay their taxes; and it was soon developed that they would content themselves with paying in the year of voting, and not in an " off year," as it was called.    They were not, the most of them, persons whom the stigma of delinquency prompted to the avoidance of it by paying every year.    It was grossly unjust to those who had property of an assessable nature, and could not, if they desired, escape the payment of " scot and lot," and to others having none, but with manliness above taking advantage of a too liberal statute, and paying biennially, that this state of things should continue.    Accordingly, the legislation of 1873, both for assessment of persons and the collection of taxes, and allowance of delinquents and disposition of them, was passed.    I say accordingly, for its obvious import is as I have described it to be.    If there was any other motive for adopting it than to secure the better payment of taxes, it does not appear on the face of it, nor are we warranted in inferring it.    A court cannot look behind the plain features of an act of assembly perfectly simple in itself to hunt for some secret purpose, unless such necessarily exists, as shown by the operation of the act itself.

The plaintiff's counsel contend that the object of the legislation of 1873 was the disfranchisement of voters, and that its effect has been to deny the ballot to citizens who should exercise it.    In order to make their point good, they have given the court an example to show how a voter is by the law deprived of his right to vote.    But the example is impossible, except upon an assumption that the party having the right to vote is defeated, or deprived of it, in spite of his efforts to enjoy it.    This is pure assumption; the fact being that the law cannot operate without the co-operation or consent of the complaining party.    If he desire to vote at elections, he has nothing to do but see to it that his name is kept upon the

assessment list, and it will be retained there; and he will have the right to vote because of that, according to the constitution, if he will keep up, like other people in like case, the payment of his tax. If he fail to pay within two years of the election he cannot vote, by the constitution, and ought not to vote. He who will not contribute his part to support the government that protects him ought not to be allowed, by the use of the ballot, to neutralize the vote of another, who does. And he who will not give himself the trouble to see that he is assessed sleeps upon his rights; and for him the maxim, *non dormientibus sed vigilantibus, leges subveniunt,* has appropriate application.

Treating the suffrage as a valuable political right, to be exercised conscientiously and intelligently, and for the public, rather than the welfare of a party, it would have been much better for the state if that feature of the act of 1843 which provided for dropping from the assessment lists those returned delinquent had been re-enacted in the act of 1873; for it is not true that delinquency is the effect of poverty. There are none so poor that they cannot pay their poll-taxes, which for them is "scot and lot;" less than two days' hire out of the wages of the common laborer being sufficient for that purpose. Labor everywhere, and always among us, is in demand. There is no hardship upon any in requiring him to pay his taxes, which in this state are county taxes alone; there being no general state tax of any kind. Men who live by their labor, or without work, who have no property, are assessed for a poll so low as to be almost insignificant. It is not poverty that creates delinquency, but a want of appreciation of the moral and political nature of the franchise, which privilege is prized by many white men, and the mass of the colored, simply because it enables them to get money by the sale of it. The notorious practice of purchasing votes by all parties here, as well as in other states, attests the truth of this assertion, and justifies the opinion expressed before about the re-enactment of the feature referred to in the act of 1843. That act was not repealed, as has been said, because it

was deemed unconstitutional; but the real purpose of it was to relieve the party just then accidentally in power from the burden of paying the taxes of their proletariat.

Taxes being necessary to the support of government, a state has the right to adopt any measures short of actual disfranchisement to compel their payment. No one doubts the validity of the provision in our statute for imprisonment of non-paying taxables. Would the law be unconstitutional because the collector might choose to take the ultimate course,—upon the eve of an election to shut up in jail non-paying citizens to whom it applied? Why would it not be? Simply because imprisonment is an extreme remedy for non-payment of liabilities, as old as the law. Then, if such a provision be valid, why is it not that for dropping from the assessment list for 12 months valid? Such an imprisonment as mentioned would effectually cut off, *pro hac vice*, the suffrage right, whereas the dropping from the list would, under the circumstances pointed out by the plaintiff's counsel, do nothing more; and in that case the dropping could not be otherwise taken than as done by the voter's consent, who had almost a whole year in which to pay his poll-tax, and thus save himself from delinquency. If the operation of the legislation of 1873 was, *proprio vigore*, to disfranchise a voter, by preventing him from paying his taxes as others are obliged to do, there would be force in the argument of the plaintiff's counsel; but, as it does not so act, and never at all except as a consequence of his own neglect, which many others in like condition of circumstances in life do not suffer themselves to be guilty of, it cannot be charged to the law that he loses temporarily the privilege of voting, but only to his own inattention to his opportunity to retain it. He has simply omitted a duty he owed to himself, and to the public,—if such persons can be supposed to be under any obligation to the body politic,—and deserves all the consequences resulting from his indifference to his interest. Without it can be shown, which it was not, and cannot be, (and that fact seemed to embarrass the learned counsel in their elaborate argu-

ment,) that the legislation of 1873 disfranchises a voter in spite of himself, or takes some advantage of him against which he had no means of protecting himself, it is too much to ask this court to avoid it as unconstitutional, and a violation of the organic law of this state.

It seems not necessary to say more than this in regard to the objection to the legislation on the ground of its alleged hostility to the fourteenth and fifteenth amendments of the constitution of the United States,—that in this state every man, rich or poor, black or white, has the equal protection of the laws at all times, whether he be a legal voter or not; the ability to vote being no more necessary to secure that protection in his case than in that of women and minors, who, and whose property, are as much under the shield of the law's protection as is that of any man, great or small. A delinquent taxable is as much safeguarded in his personal rights as is he who owns houses and land. The notion that the right to exercise the suffrage is, in Delaware, necessary for the protection of one's person or property, is purely fanciful, and without any reality of reason. The fifteenth amendment was meant to secure the right to vote to colored people, and has done it everywhere. Their delinquency generally as tax-payers, or failure to become assessed, is not the fault of the statute, and cannot properly be charged against it. To hold the assessment act void as in conflict with that amendment would be a strain of interpretation which would seem to be repugnant to plain common sense.

GRUBB, J., (concurring.) This case is before us upon questions reserved and directed to be heard in this court upon a case stated in an action on the case in the superior court in and for New Castle county, for the recovery of damages resulting to the plaintiff by reason of his having been deprived by the defendants, when acting as members of the levy court of said county, of all opportunity of paying a county tax for the year 1886, and thereby qualifying himself to vote at the general election in that year. It is shown by

the record, and admitted, that the plaintiff is a white male person, and was in all respects, except as to the payment of a county tax, qualified to enjoy the right of an elector in this state at said election. It is also admitted that he was duly assessed and rated for a poll-tax for the year 1885 in the north collection district of Wilmington hundred ; that the warrant for the collection of said tax was duly issued to Patrick Neary, the collector for said district ; and that the said collector of taxes, having given the notices prescribed by law, and having attended, and remained in attendance, pursuant to said notices, and conformably with the statutory requirements for the collection of said tax, duly returned the plaintiff to the levy court of said county, on March 2, 1886, as a delinquent,—the plaintiff not having paid his poll-tax to him as such collector. It is also admitted that the plaintiff was not dead, and had not left the state, and that the said levy court had no evidence on the subject before it except the collector's return of the plaintiff as delinquent, and his affidavit, verified by his oath, and filed as prescribed by law, of his having, prior to said return, given the notices, and attended and remained in attendance as aforesaid. It is also admitted that subsequently, on March 29, 1886, the said levy court did allow to the said collector the said poll-tax of the plaintiff, and did cause the name of the plaintiff to be struck and dropped from the said assessment list, whereby no tax was assessed or laid upon the person of the plaintiff for the next ensuing year, (1886,) and the plaintiff was deprived of any and all opportunity, at any time thereafter, to pay a county tax for the said year (1886) then next ensuing, and thereby of the right to qualify himself as an elector to vote at the general election in said county held on Tuesday, November 2, 1886. It is further admitted that the plaintiff had paid no tax, under any preceding assessment, within two years of and prior to said election. The defendants justify their action in dropping and striking the name of the plaintiff from said assessment list, and in failing to levy a tax on him for the year 1886, under the provisions of he

act entitled " An act in relation to the collection of taxes in this state," passed April 10, 1873, being 14 Laws Del., c. 372, and also under the provisions of section 9 of an act entitled " An act in relation to the duties of assessors and of the levy courts in the several counties of this state," passed April 9, 1873, being 14 Laws Del., c. 371, and the defendants also claim that they cannot be held personally liable in damages for their action as members of said levy court, while, on the contrary, the plaintiff claims that the provisions of said acts under which the defendants justify their action as aforesaid are unconstitutional and void, and that the defendants are personally liable to him for their said action.

In this connection, it is important to note that the plaintiff does not complain that he was deprived at any time of the opportunity to pay his tax for 1885, either before or after he was returned and allowed as a delinquent as to said tax, and thereby of the right to qualify himself as an elector at said election. He rests his case, as the record shows, exclusively upon his exclusion from the assessment list for 1886, and from all opportunity to pay a tax for that particular year. His suit is instituted for damages for his non-assessment for 1886, by reason of the " dropping " of the plaintiff from the assessment list of 1885, and his exclusion from the assessment list of 1886 by the defendants pursuant to the express requirements of the provisions of section 1, c. 372, and of section 9, c. 371, vol. 14, aforesaid. It is not instituted because of the " extinguishment " of his tax for 1885 pursuant to the express requirements of the provisions of section 18, c. 12, Amend. Code, (enacted prior to said acts of 1873,) whereby he was prevented from paying said tax at any time prior to the said election of 1886. Therefore, all objections urged at the argument against the validity of said provisions of the acts of 1873 on the ground that the plaintiff was not permitted to pay his tax for 1885 at any time up to the said election, and was thereby precluded from obtaining a receipt therefor, as the evidence of his being qualified to vote thereat, are not pertinent to the present inquiry. Consequently,

the determination of that question upon this occasion would be *obiter dictum* in the case before us. The real question in the case is whether or not the provisions of the acts of 1873, requiring the exclusion of the plaintiff in March, 1886, from assessment for that year as a poll taxable, because he was, in said month, returned and allowed as delinquent for 1885, are unconstitutional, and not whether the provisions of section 18, c. 12, Amend. Code, requiring the extinguishment of the tax of such delinquent, are or are not so. Accordingly, the questions actually reserved for the decision of this court are : *First,* whether or not the said provisions of the acts of 1873, considered with reference to the case of the plaintiff as presented by the record, are unconstitutional and void ; and, *second,* if said provisions be so, whether or not the defendants are personally liable to the plaintiff in damages for their action thereunder as members of the said levy court.

The first of these questions raises the following principal inquiries : *First.* Are said controverted provisions of the acts of 1873, in their primary purpose and design, a regulation of the assessment and collection of county taxes, or a regulation of the qualification of electors ? *Second.* If the former, are they a legitimate and appropriate exercise of the taxing power ; that is to say, in accord with the inherent nature, essential characteristics, and true meaning and purpose of taxation ? *Third.* If they be such legitimate exercise of the taxing power by the general assembly, are said provisions of the acts of 1873 nevertheless unconstitutional and void because they have caused the plaintiff to be excluded from the assessment list for 1886, and, consequently, precluded him from being qualified to vote at the general election in that year. These inquiries necessitate the consideration of the said acts of 1873, construed in connection with the pre-existing statutes of the state in force at the time of their enactment, and relating to the apportionment, assessment, and collection of taxes. They also require the true interpretation of the constitution of this state in respect to the scope of the legislative authority in the exercise of the taxing

power, as well as in regard to the nature of the elective franchise, with the view of ascertaining whether the latter is subordinate or paramount to the legitimate exercise by the legislature of the taxing power for the purpose of raising, with regularity and certainty, the public revenue necessary for the support of government, and the promotion of the general welfare.

In the exercise of the power of taxation, the general assembly has designated and empowered certain instrumentalities or agencies for the assessment and collection of county taxes. These are the levy courts and the assessors and collectors in the several counties. Their duties are prescribed, and their powers conferred, by statutory provisions which, in the legislative judgment, are deemed necessary and appropriate. The system of county taxation existing and in operation at the time of the enactment of the said acts of 1873, under pre-existing statutory provisions then in force, was, substantially, as follows: In each county the assessors were required to assess, in the first instance, and the levy court to correct and complete the assessment of all real and personal property not exempted by law, and all polls of every freeman above the age of 21. A general assessment was to be made once in every four years, and a supplementary assessment annually. The assessor in each hundred or assessment district was required to complete his assessment by the 1st day of January in every year, and, after posting the same, and giving public notice as prescribed by law, to sit for the purpose of correcting any errors therein, or for the purpose of assessing persons omitted. Thereupon he must return his assessment to the levy court on the first Tuesday of February. It was made the duty of the levy court to sit as a court of appeal on the first Tuesday of March in every year, and such other days as should be necessary, to determine appeals against the assessments returned by the assessors, and to add to and correct the same, and to complete said assessments by the last day of March. Thereupon the levy court was required to ascertain the amount necessary to be raised by taxation for the year, and to apportion and lay the taxes

for the same to and upon the assessments in the several hundreds at a certain rate upon every $100 of the said assessments, and also to cause to be issued, on or before the first Tuesday of April, to the collectors of taxes, respectively, a duplicate of the assessment list of his hundred or collection district, with a warrant thereto annexed. By the provisions of chapter 12, Amend. Code, it was made the duty of every collector of county taxes to enforce payment of any tax unpaid, after due demand by him, by sale of the personal and real property of the taxable, and, in case he should be unable to find property sufficient therefor, he was authorized to enforce payment thereof by imprisonment of his body. The collector was required by section 10 of said chapter 12 to render to the levy court on the first Tuesday of March next after the date of his warrant, a true account of all taxes it was his duty to collect, and of all the payments made, and of all delinquents. By section 21 of chapter 8, Amend. Code, it was provided that "at the meeting in March in every year the levy court shall examine, adjust, and settle the accounts of the collectors, making all just allowances, and the adjustment and settlement shall be final; and the court, if deemed expedient, may require other accounts from the collectors. They shall at the said meeting examine and settle the delinquent list of each collector, as well of state as of county taxes, and make allowance of delinquents; and upon such allowance the collector shall be credited with the amount thereof. The name of the delinquent, if he be dead, or have removed from the state, shall be struck from the assessment list, and also from the collector's duplicate; otherwise, it shall remain on the assessment, and be entered on the collector's duplicate for the succeeding year." It was also provided by section 18 of said chapter 12 that "no collector, nor his executors or administrators, shall collect or receive any tax after two years from the date of the warrant. After that date it shall be extinguished. Nor shall he at any time collect or receive any tax allowed as delinquent, but the same shall be extinguished." The foregoing system, and the statutory provisions relating to it,

which are material to the present inquiry, are still in operation and full force, except so far as they have been modified by the acts of 1873, which are, in their purpose and effect, merely amendatory and supplementary thereto.

Under the legislation prior to the enactments of 1873, provision was made expressly requiring the dropping of the names of those who had died or had removed from the state in any year from the assessment lists of the next ensuing year. But no such provision was made for the dropping also of the names of those who had been found by the collector to be incapable of paying any tax, or to be fictitious and non-existent, and therefore incapable of dying or removing from the state. *Humanum est errare.* In the nature of things, therefore, under said legislation, many such names would inevitably creep into and accumulate upon the assessment lists from year to year, for obvious reasons, in the administration, through human agencies, of a system which, though primarily designed for the raising of public revenue, yet also, incidentally, furnished the means for qualifying as voters,—especially for closely-contested elections,—by the payment of a county tax as prescribed by the constitution of the state. But, unless the assessment of property and polls be accurate and reliable, it must necessarily follow that the tax-rate based upon it for raising the amount of revenue needed in any year will be inadequate, and a deficit in the county treasury will consequently ensue.

The clear, explicit, unambiguous provisions of the acts of 1873, throughout their entire extent and scope, disclose an unmistakable intention, and a pervading purpose, to supply the deficiencies of previous legislation, and secure a more accurate assessment of the property and polls in the several counties, in order to have a more exact basis for fixing an adequate rate of taxation in every year. Accordingly, the act passed April 9, 1873, and entitled "An act in relation to the duties of assessors, and of the levy courts, in the several counties of this state," being 14 Del. Laws, c. 371, makes express, explicit, and very careful provision for the accomplishment

of this purpose.   It makes it unlawful for any assessor to place on the assessment list the name of any person who is not the owner of taxable real or personal property within his assessment district, unless he shall be satisfied, from personal knowledge, that such person is of lawful age, and is a *bona fide* resident of his district.   It also requires every assessor, within 10 days after completing his assessment list, to post the same as prescribed by the act, and to give notice that he will attend, at the place, day, and hours therein specified, to correct any errors in his assessment, and for the purpose of assessing any person who may have been omitted.   He shall at the same time give notice that any person desiring to be assessed must apply in person before him, at the time and place mentioned in said notices, and prove his right to be assessed by the oath or affirmation of some respectable freeholder of the county that he (the applicant) is the identical person he represents himself to be, and known to said freeholder personally to be such ; that he is 21 years of age; and that he is *bona fide* resident in the hundred and county of the assessor, and in the state of Delaware.   If the assessor cannot complete the correction of his assessment on the day named in said notices, he may adjourn as prescribed in the act.   In case of inability, from any reason, to attend at the time specified in his notices, he shall appoint some other day, and give notice thereof in the same manner as aforesaid.   The act then, by express provisions, imposes severe penalties upon the assessor for the refusal or omission to place upon the assessment the name of any person who appears and makes proof, in the prescribed manner, of his right to be placed thereon.   It also imposes penalties upon the assessor for knowingly placing upon the assessment any fictitious name, or the name of any person not at the time resident in the hundred or assessment district, and also upon any person who shall procure or cause to be placed upon the assessment in any hundred or assessment district the name of any person not entitled to be assessed in said hundred or district, or shall knowingly procure or cause to be placed thereon any fictitious or fraudulent name.   It

further provides " that it shall not be lawful for the levy court in either of the counties of this state, or any member thereof, to take from the assessment returned to the said levy court by any assessor the name of any person appearing thereon ; nor shall it be lawful for such levy court, or any member thereof, to add to any assessment returned as aforesaid the name of any person, unless upon the personal application of such person, and upon proof of his right to be assessed," (section 6,) in the manner already stated ; and for the violation of this provision a severe penalty is also imposed. The act further provides, in section 9 thereof, " that it shall not be lawful for any assessor or any levy court, upon the personal application of any one, or otherwise, to place upon the assessment in any hundred the name of any person who, having failed to pay the county tax assessed against him or her for the preceding year, was returned and allowed as a delinquent, until after the expiration of the twelve months from the time such allowance as delinquent was made by the levy court."

It is clear, beyond question, that the object of this act was, through very specific provisions, enforced by positive penalties, to secure an accurate assessment, by excluding therefrom, in the first instance, so far as the assessors could detect them, and do so, all fictitious names, as well as the names of those who were disqualified for assessment for want of the prescribed age or residence. But it was manifest that, to make the assessment accurate, for the purpose of preventing a needless deficit, the lists must be purged, not only of these fictitious names which had escaped the vigilance of the assessors, and could subsequently be discovered by the collectors, but also of the names of all those whose tax the collector should find could not be effectually collected, even by means of legal process ; in short, of those who should be ascertained to be unproductive as taxables. An act auxiliary and supplementary to said chapter 371 was therefore needful. Accordingly, on the day next after the enactment of said chapter 371, the general assembly passed an act entitled " An act in relation to the collection of taxes

in this state" being chapter 372, vol. 14, aforesaid. The provisions of this statute are substantially as follows: Section 1 makes it the imperative duty of every collector of county taxes in each hundred or collection district in this state, within 30 days after he shall have received his duplicate list, (in April of every year,) to give public notice, in the manner prescribed in the act, stating in such notice his place of residence or of business, and his readiness to receive taxes. They make it also his duty, in the month of January in each year, again to give public notice, as aforesaid, of at least 10 days, which last mentioned notice "shall state the times and places at which such collector will attend for the purpose of receiving taxes then due and unpaid; and it shall be the duty of the levy court in every county, upon proof being made to them by the affidavit of the collector, verified by his oath or affirmation, and filed in the office of the clerk of the peace for the respective county, setting forth that he has given notice as required by this section, and that, in accordance with the notice last above mentioned, he did attend at the times and places designated in such notice for the reception of taxes, and did remain for the space of at least five hours in each day, and for the period of at least three days, in attendance, for the purpose of collection of taxes aforesaid, to allow said collector, as delinquencies, the taxes uncollected by him; and the names of such delinquents shall be dropped from the assessment list by the levy court, and shall not be placed thereon again for a period of twelve months from and after the date of such allowance." Section 1 also declares that these provisions shall apply to persons assessed and liable to pay poll-tax. Section 2 provides "that the notices required to be given in section 1 of this act by the collector aforesaid shall be deemed and taken to be sufficient demand upon taxables for the payment of taxes standing against them on the collector's duplicate of the several hundreds and collection districts of this state. Such notices, given as aforesaid, shall be considered a performance and full discharge of the duty of the collectors aforesaid to make demand for taxes; and they shall not be required there-

after to make further demand on any taxables for said taxes as a condition precedent to the employment of legal process as now provided by law for the collection of taxes." Section 3 makes it the duty of the collector to give receipt for taxes received, and, in addition to his signature, to make the impression of the seal (for which it makes provision) of the hundred or collection district of which he is collector upon all receipts given by him for county taxes. Sections 4 and 5 impose penalties upon the collector for using, or permitting the unlawful use of, said seal, and upon all others for counterfeiting said seal or participating in the fraudulent use of the same· The salient feature of this act is the mandatory provision that the levy court, upon the return of the collector's delinquent list, as provided by section 10, c. 12, Amend. Code, and upon the evidence of his affidavit made and filed as prescribed in section 1 of the act, shall allow said collector as delinquencies the taxes uncollected by him ; and that the names of such delinquents shall be dropped from the assessment lists by the levy court, and shall not be placed thereon again for a period of 12 months from and after the date of such allowance.

Prior to the enactment of chapter 372, none but the names of delinquents who were dead or had removed from the state were permitted by law to be struck from the assessment list. All others were required to be retained thereon, and to be entered on the collector's duplicate for the next ensuing year. By the requirements of the foregoing provision of said chapter, therefore, in addition to to the names of the dead, and of the removed from the state, the names of the fictitious which have been erroneously assessed by the assessors or the levy court, as well as of those whose taxes shall be found uncollectible by legal process, shall, when returned as delinquents by the collector, be dropped from the assessment, and shall not be placed thereon for the next ensuing year. The collector is thus made an efficient auxiliary in purging the lists of unproductive taxables, and securing an accurate assessment; thus preventing a deficit for the next ensuing year. Through the operation of sec-

tion 1 of chapter 372, and of the penal provisions of section 9, c. 371, the collector's return is made imperatively binding upon the assessors and the levy court. Each act is, therefore, manifestly designed to operate in connection with the other as a component part of the pre-existing county revenue system, and as amendatory thereof and supplementary thereto. The practical effect of their provisions is to make the collector exclusively the agent of the legislature, in its exercise of the taxing power, to ascertain and determine finally and conclusively, in the mode prescribed by law, whether or not those whom he shall return as delinquents will be productive taxables for the next ensuing year.

In addition to the foregoing, there are other important provisions of the acts of 1873. They define with greater precision the duties of the county revenue officials, and prescribe specifically what shall be a performance and full discharge of duty in certain respects. In so doing, they relieve public functionaries from embarrassing uncertainty as to their duty, and from harassing anxieties as to their liability, which are unjust to the officer, and detrimental to the public service. At the same time, they afford the individual citizen due notice, and ample opportunity to become assessed and to pay his tax, if he exercise reasonable diligence, and take care to see that the obligations and the penalties which the law imposes are enforced against those officials who presume to violate those provisions which the legislature has enacted for the vindication of his rights, and the promotion of the public welfare.

Further analysis of these acts is needless. They speak for themselves. There is no ambiguity in their language, and no room for doubt as to their design. Everywhere throughout them there is apparent, in the natural meaning of their phraseology, and in the plain import of their provisions, a dominating purpose so to amend the revenue system as to provide for the assessment and collection of county taxes with greater exactness and regularity, and to define the duties and liabilities of the revenue officials with greater precision and certainty. This purpose is indicated in their titles, is

implied in their reference only to the officers exclusively intrusted with duties pertaining to revenue, and is disclosed through their essential and inseparable connection with the entire Code of county revenue legislation, of which, for their own effectual operation, they must necessarily form a constituent part. Hence, it cannot be maintained that they are primarily a regulation of the suffrage, and secondarily only a regulation of taxation. For, if this be true, then it may be maintained with equal reason that the entire county assessment and collection system, since it is necessarily employed for the qualification of voters through the payment of a county tax, is therefore primarily intended and established to regulate the qualification for voting, rather than to provide for the collection of revenue. The mere statement of this proposition is sufficient for its refutation. Accordingly, the conclusion is irresistible that in their primary purpose and design the provisions drawn in question by the plaintiff's case are intended as an exercise of the taxing power by the legislature with the view of improving the efficiency of the county revenue system. Whether or not it is the wisest and most effective plan for accomplishing this result which could be devised is immaterial to the question of their constitutional validity. They have been adopted as a means for effecting this result, which appeared to the legislative judgment, as we must presume, to be the most suitable and most effectual for its accomplishment. Being so, the said provisions must be presumed to be valid, and of binding force, until their enactment shall be shown to have been, in constitutional comtemplation, unwarranted and prohibited. Cooley, Const. Lim., 168, and cases there cited.

We now come to the second general inquiry, whether or not, if the said provisions be considered as primarily a revenue regulation, they are a legitimate exercise of the true function of taxation, that is to say, in accord with its essential characteristics and purpose, and not in conflict with those limitations upon it which have been held by courts of high authority elsewhere to inhere in the very nature of the power of taxation itself, and to be equally im-

perative whether declared in written constitutions or not.   Cooley, Tax'n, 41 ; *Brick Co. v. Brewer*, 62 Me., 62 ; *State v. Readington Tp.*, 36 N. J. Law, 66 ; *Sharpless v. Mayor*, 21 Pa. St., 168 ; *Hammett v. Philadelphia*, 65 Pa. St., 151 ; *In re Washington Avenue*, 69 Pa. St., 363, 364 ; *Knowlton v. Supervisors*, 9 Wis., 410.

Taxes are defined to be, to use the language of Judge Cooley, " burdens or charges imposed by the legislative power upon persons or property to raise money for public purposes.   The power to tax rests upon necessity, and is inherent in every sovereignty.   The legislature of every free state will possess it under the general grant of legislative power, whether particularly specified in the constitution among the powers to be exercised by it or not."   Cooley, Const. Lim., 479.   Chief Justice Marshall has said of this power : " The power of taxing the people and their property is essential to the very existence of government, and may be legitimately exercised on the objects to which it is applicable to the utmost extent to which the government may choose to carry it.       *       *       * The people of a state, therefore, give to their government a right of taxing themselves and their property ; and, as the exigencies of government cannot be limited, they prescribe no limits to the exercise of this right, resting confidently on the interest of the legislator, and on the influence of the constituents over their representative, to guard them against its abuse." *McCullough v. Maryland*, 4 Wheat., 428.   Judge Cooley continues : " Having thus indicated the extent of the taxing power, it is necessary to add that certain elements are essential in all taxation, and that it will not follow, as of course, because the power is so vast, that everything which may be done under pretense of its exercise will leave the citizen without redress, even though there be no conflict with express constitutional inhibitions.   Everything that may be done under the name of taxation is not necessarily a tax ; and it may happen that an oppressive burden imposed by the government, when it comes to be carefully scrutinized, will prove, instead of a tax, to be an unlawful confiscation of property, unwarranted by any principle

of constitutional government. In the first place, taxation having for its own legitimate object the raising of money for public purposes, and the proper needs of government, the exaction of moneys from the citizens for other purposes is not a proper exercise of this power, and must therefore be unauthorized." Cooley, Const. Lim., 487. " In the second place, it is of the very essence of taxation that it be levied with equality and uniformity, and, to this end, that there should be some system of apportionment. Where the burden is common, there should be common contribution to discharge it." Id. 495. "But, to render taxation uniform in any case, two things are essential. The first of these is that each taxing district should confine itself to the objects of taxation within its limits." Id. 499. The second essential is that apportionment of taxes should reach all the objects of taxation within the district. Of the correctness of this as a principle there can be little doubt, though there may sometimes be difficulty in determining whether in practice it has been applied or not. Id. 501. " Absolute equality and strict justice are unattainable in tax proceedings. The legislature must be left to decide for itself how nearly it is possible to approximate so desirable a result.    *    *    *    The legislature must also, except when an unbending rule has been prescribed for it by the constitution, have power to select, in its discretion, the subjects of taxation. The rule of uniformity requires an apportionment among all the subjects of taxation within the districts, but it does not require that everything which the legislature might make taxable shall be made so in fact. Many exemptions are usually made from taxation, from reasons the cogency of which is at once apparent." Id. 513, 514. " The constitutional requirement of equality and uniformity only extends to such objects of taxation as the legislature shall determine to be properly subject to the burden. The power to determine the persons and the objects to be taxed is trusted exclusively to the legislative department; but over all those objects the burden must be spread, or it will be unequal and unlawful as to such as are selected to make

the payment." Id. 515. "It is, moreover, essential to valid taxation that the taxing officers be able to show legislative authority for the burden they assume to impose in every instance. Taxes can only be voted by the people's representatives." Id. 517.

The foregoing extracts from Judge Cooley's valuable treatise on Constitutional Limitations, present clearly, comprehensively, and succinctly the leading principles illustrating the nature and extent of the power of taxation, and the limitations upon its exercise inherent in the nature thereof, which have been approved by courts and text-writers of acknowledged authority. Without being understood either to define or to declare to what extent, in all cases, said principles shall, in all respects, be applicable and authoritative in this state, it is nevertheless proper to consider whether the said provisions which are complained of in this case are not, so far as they affect the plaintiff, in accord, instead of in conflict, with said principles. By section 1, art. 2, of the constitution of Delaware, the legislative power of this state is vested in the general assembly. There being no express grant of the power of taxation, it passed to the general assembly, under the general grant of legislative power, as an attribute of sovereignty essential to the existence of the government, and indispensable to the promotion of the general welfare. Excepting the provisions of section 14, art. 2, of the constitution of this state, respecting the mode of framing and passing bills for the raising of revenue, there is no express limitation therein upon the exercise by the legislature of the taxing power. Unless, therefore, some clearly implied restriction be found, inherent in the nature of taxation itself, or in some express constitutional provision, the statutory provisions in question must be sustained as a valid exercise of the taxing power. It has not been shown that they were enacted for other than a public purpose. Nor does it appear anywhere in the case before us that they impose any fiscal burdens upon the plaintiff, and are for that reason not uniform and equal. As a matter of fact, instead of imposing taxation upon him for the year 1886, they demonstrate that he is incapable of

paying a tax.    Instead of discriminating arbitrarily and unequally, by making him bear the burdens of others belonging to his own poll class of taxables, the truth is that the non-delinquent taxables were obliged in 1886 to bear the extra taxation necessary to make good his delinquency in 1885.    The latter might justly urge the unequal effect of the operation of said provisions, were it not for the fact that, owing to his inability to pay any tax, (which must be presumed from the return of the collector,) his exclusion from assessment, in reality, neither increased nor diminished their actual burdens thereafter.

But, even if it were otherwise, and the non-delinquents, by operation of the said provisions, could rightfully complain that thereby the non-assessment of the plaintiff because delinquent imposed his share of taxation upon them without due process of law, yet the plaintiff cannot in this case avail himself of their cause of action.    He has sued in the case before us for damages, because, by operation of the said provisions, no tax was imposed upon him in 1886, and not because he is wronged by an unequal burden of taxation.    He cannot successfully urge that which is not an injury to himself as a ground for invalidating these statutory provisions. He does not complain on that ground, nor is he in a situation to so complain as being one who has been obliged to pay an unequal tax. It is well settled that the courts will never pronounce a statute unconstitutional because it may impair the right of others not complaining.    A statute is assumed to be valid until some one complains whose right it invades.    *Antoni v. Wright*, 22 Grat., 857 ; Cooley, Const. Lim., 164.    As was said by this court, upon this very point, in *Coyle v. Commissioners*, (1884, not yet published :) " It will be time enough to consider this question, and the rights of the parties that may be affected thereby, when it shall be presented for our consideration by parties capable of making it, and having an interest in its determination.    No such parties are before us." As heretofore stated, the primary purpose of the enactment of said provisions of the acts of 1873 was to secure a more reliable assess-

ment, by excluding therefrom all unproductive taxables, in order to prevent a constantly recurring annual deficit. It is a well-settled rule of constitutional construction that when a constitution gives a general power, or enjoins a duty, it also gives, by implication, every particular power necessary for the exercise of the one or the performance of the other. Therefore, the power to raise by taxation sufficient revenue for the needs of government necessarily includes the power to make reasonable provision for preventing a deficit. This, as has been shown, was the object of the legislature in the enactment of the provisions complained of by the plaintiff. In its judgment, they were deemed necessary and appropriate to the object in view. For this purpose, they have, in effect, made the collector in each hundred and collection district the sole and final judge of the incapacity for the payment of a tax (and consequently of his unproductiveness as a taxable for the next ensuing year) of any one whom the collector shall return as a delinquent in any year. He has been selected by the legislature, in the exercise of the taxing power, as its agent, for this duty, because, as must be presumed, he is the most suitable revenue official for the purpose. Being charged by law with the special duty of collecting taxes, and employing legal process in that behalf, and being also under the obligations of his official bond to fully discharge his duty, he is, presumably in the legislative judgment, the revenue official best qualified and most likely to discover the productiveness or unproductiveness of the taxables on his annual duplicate. Having given bond, and being liable civilly and also criminally for corrupt and malicious conduct in his office, he cannot reasonably be said to be an irresponsible officer. Nor is it true, as was contended for the plaintiff at the argument, that the collector is clothed, under the provisions of the legislation of 1873, with authority, arbitrarily, and at his mere will and pleasure, to decide what poll taxables shall, and what poll taxables shall not, pay tax for the ensuing year, and with unrestrained power of choice as to whom he will return as delinquent. Under the provisions of sections

11-14, c. 12, Amend. Code, it is made the imperative duty of the collector to sell the personal and real property of every taxable who shall fail to pay his tax to the collector after 10 days' demand, in order to enforce payment thereof; and for the same purpose, in case he shall not find sufficient property, he is authorized by section 15 of said chapter 12 to take and imprison the body of every such taxable. Again, under the provisions of section 10 of said chapter 12, the collector is also imperatively required, " on the first Tuesday of March next after the date of his warrant, to render to the levy court a true account of all taxes it was his duty to collect, and of all payments made, and of all delinquents." These provisions were not repealed, nor altered, by the legislation of 1873, but, on the contrary, were recognized by it as of continuing force and obligation. Accordingly, the provisions of 1873 must be construed in connection with them. This being so, the absolute duty is imposed by law upon the collector to collect from all alike, without favor or discrimination, and to return all as delinquents and unproductive taxables whose tax cannot be collected on demand, or by legal process. If the collector shall act arbitrarily and corruptly, and disregard his duty, he will do so in direct violation of said statutory provisions, and of the meaning and purpose of the legislation of 1873. He would, therefore, act not by authority of, but contrary to, the law. While this will be a good reason for the punishment of the offending collector, yet it is not recognized by the courts as a sufficient ground for declaring the provisions of a statute unconstitutional and void. *Patterson v. Barlow,* 60 Pa. St., 54. It is therefore the undeniable duty of the collector to make diligent inquiry, and exhaust legal process, wheresoever effectual, in the effort to collect the tax of the citizen, before he shall return him to the levy court as a delinquent or unproductive taxable. This is the duty which he owes to the public under the mandates of the law, and the obligations of his bond. He also owes to the individual citizen the duty of giving the two several notices prescribed by section 1 of said chapter 372, vol. 14, and the opportu-

nity, in accordance therewith, to pay his tax. Upon the discharge of these several duties, he shall make his said return to the levy court, and the same shall be conclusive that the delinquent, in legislative contemplation, will be unproductive as a taxable for the next ensuing year, and accordingly his name shall be excluded from the assessment list for that year. It is necessary that this return shall be conclusive of this fact, in order to exclude him from the assessment list, and so prevent a deficit, in fulfillment of the purpose of the statute. Unless such fact be ascertained during March of any year, it would become impossible to complete the assessment, and have the duplicate and warrant in the hands of the collector in April of such year, as prescribed by law. Consequently, unless this fact can constitutionally be ascertained in the mode and at the time prescribed, the provisions of the act would be nugatory, and their primary purpose frustrated. Hence, this mode of ascertainment of a fact essential to the indispensable collection of public revenue with regularity and certainty is necessary to the proper execution of the taxing power, and is an appropriate and legitimate exercise thereof by the general assembly. *Hagar v. Reclamation, Dist.*, 111 U. S., 701-715; 4 Sup. Ct. Rep., 663; *Wilson v. Railroad Co.*, 5 Del. Ch., 538, 545; Cooley, Const. Law, 87.

The delinquent cannot complain that he has had no "day in court," and no opportunity to disprove the fact conclusively established by the return. In contemplation of law, he has received notice to appear, through the notices given by the collector at the precise time specified for the giving thereof in said section 1 of chapter 372. Thereby he has his opportunity to show his capacity as a taxable for the next ensuing year by appearing in accordance with said notices, and paying his tax to the collector. Not having done so, he is legally concluded by the determination and the return of the collector. *Hagar v. Reclamation Dist.*, 111 U. S., 701-715; 4 Sup. Ct. Rep., 663. In the present instance the plaintiff admits, as the record discloses, that he was duly assessed as a poll taxable, and that he had legal notice and opportu-

nity to appear before the collector, and show his capacity as a tax-able for 1886, but that he did not do so.  He admits that he had not, within two years next before the general election in that year, paid any tax, and does not allege or show that he was able or will-ing to pay any tax either for 1885 or 1886.  He admits that the collector was in attendance for the reception of his tax, conforma-bly to his notices given as prescribed by the act; but he does not allege or show that the collector ever refused to receive it, or de-prived him of a free and ample opportunity to pay it.  Nor does he allege or show that the collector had not fully and in good faith discharged his official duty, and exhausted all lawful and effective means in an earnest effort to collect his tax before he returned him as a delinquent and unproductive taxable.   So that the verity of the statutory presumption established by the collector's return is nowhere impeached by the record.

In this connection, some observations may be made which seem both appropriate and material to the present inquiry, as being illustrative of the serious and not trivial importance as well as of the real necessity of these legislative provisions for ascertaining what portion of the citizens belong to the productive class, and what portion to the unproductive class, of poll taxables, with a view to securing an accurate assessment, and thus prevent, through an exact and business-like administration of the county revenue system, an annually recurring deficit.   As hereinbefore shown, the collection law of 1873 was enacted to be auxiliary to the assessment law of that year, for the purpose of excluding from the assessment lists in any year, through the inquiry and return of the collector, all fictitious names, and also the names of all others who would be unproductive taxables in such year, which had been placed upon the assessment list in the preceding year through the error, or other-wise, of the assessor or levy court.   It was argued by counsel for plaintiff that thousands of poll taxables are annually returned as delinquents, but that this is done by the collectors arbitrarily, and without just reason or necessity.  The fact is true as stated, but the

deduction therefrom was unwarranted. The fact that thousands of poll taxables are annually returned as delinquents by the collectors is not shown by the record in the case before us, but it is shown by the official records of the county revenue officers. Careful examination of these shows that, in addition to those who subsequently die, or remove from the state, there have been placed upon the assessment lists in a single year, in Wilmington alone, not only hundreds, but thousands, of names of persons who never existed, and also great numbers of those whose taxes could not be collected even by legal process. That thousands of these were fictitious names of persons who never existed, is demonstrated by the disproportion which the assessment bears to the population as shown by the census reports. That thousands of the remainder were absolutely unproductive taxables, against whom legal process was wholly unavailing, is a fact which, beyond question, can be conclusively established. While this demonstrates the infirmity of human instrumentalities, and the inadequacy of even the present assessment laws and their penal provisions, it also significantly demonstrates the necessity for, and emphasizes the value of, the collection law of 1873, by operation of which these flagrant faults in the assessment lists are annually corrected through the agency of the collector.

The consideration of the third general inquiry is now reached. It is contended in behalf of the plaintiff that the provisions of the acts of 1873, of which he complains, by causing his exclusion from the assessment lists for 1886, thereby operated to deprive him of the opportunity to pay a county poll-tax, as his qualification for the enjoyment of the right of an elector of this state at the general election in that year, and therefore that these provisions are unconstitutional and void, as being violative of sec. 1, art. 4, and of sec. 3, art. 1, of the constitution of this state. Section 1, art. 4, provides that a citizen of the age of 22 years or upwards, (and otherwise qualified,) "and having, within two years next before the election, paid a county tax, which shall have been assessed at least six months before the election, shall enjoy the right of an elector." Section 3 of article

1 provides that "all elections shall be free and equal." It has been shown that said provisions of the acts of 1873 were enacted by the legislature in the legitimate exercise of the taxing power, and were appropriate and necessary to the due execution thereof, and were, in their primary purpose and design, a regulation of the collection and assessment of county taxes, and but incidentally and secondarily a regulation for the qualification of electors. The plaintiff's contention, therefore, directly raises the question, has the general assembly, according to the true meaning and intent of the constitution of this state, authority to exclude from the assessment, in any particular year, a citizen who has been ascertained, by a mode appropriate and essential to the effectual exercise of the taxing power, to be, in the legislative judgment, an unproductive taxable for that year? This is the controlling question in the case presented by the record. There is no need, upon the present occasion, of considering or declaring the extent of legislative power and discretion beyond the requirements of this pivotal question. If it shall be decided affirmatively, the controverted provisions of the acts of 1873 must be sustained as constitutional and valid. The taxing power, and also the privilege of exercising the elective franchise, are both conferred by express but separate provisions of the same constitution,—the former by section 1 of article 2, and the latter by said section 1 of article 4. No express limitation upon the taxing power in respect to suffrage is found in that instrument. Therefore, if any restriction upon such power exists, it must appear by clear implication from some other express provision of the constitution. To ascertain this, resort must be had to a proper construction of the entire instrument. Every enactment of the state legislature is presumed to be constitutional and valid until the contrary is shown. There is no safe rule for construing the extent or limitation of powers in a constitution "other than is given by the language of the instrument which confers them, taken in connection with the purposes for which they were conferred." *Gibbons v. Ogden*, 9 Wheat., 188. "But it is not on slight implication and

vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other." *Fletcher v. Peck*, 6 Cranch, 87, 128.

If examined according to these approved rules of construction, can it be said that any restriction upon the taxing power, as exercised by the legislature in the present instance, appears by clear implication from the said provisions of article 4 relating to the qualifications of electors? The language of said article, " having, within two years next before the election, paid a county tax, which shall have been assessed at least six months before the election," clearly contemplates the necessity of a preceding assessment. The right to qualify for the suffrage, therefore, is by the constitution itself made dependent upon the action of the legislature in the exercise of the taxing power. Unless the legislature has authority to prescribe an appropriate and necessary mode of ascertaining who will be unproductive subjects of taxation in any year, and to exclude such from assessment in that year, it cannot successfully raise, with certainty and regularity, adequate revenue for support of the government, and thus fulfill the purpose for which it was vested with the taxing power; for, if required to assess those who have been ascertained by such mode to be unproductive as taxables, an annual deficit must inevitably result, and the purpose of the taxing power be thus frustrated. To hold, therefore, that the legislature is imperatively required to assess a citizen so found to be unproductive is to assert that the existence of government is of subordinate importance to the privilege of suffrage. Such a proposition is untenable, as it is absurd. Without organized government, there can be neither qualification for, or exercise of, the suffrage, nor protection of life, liberty, or property, nor promotion of the general welfare. Without adequate revenue, raised with regularity and certainty, efficient and stable government cannot successfully be maintained. It necessarily follows that the authority of the legis-

lature, in the exercise of the taxing power, to prescribe all appropriate and needful regulations for the selection and assessment of those only who · will be productive taxables, is paramount to any alleged right of the unproductive citizen to be assessed. When section 1 of article 2 of the constitution vested the taxing power in the general assembly, and gave to the legislature the general power, and enjoined the duty, to provide for the raising annually, with certainty and regularity, of needful revenue for the support of the several county governments, it also gave by implication every particular power necessary for the exercise of the one, or the performance of the other.

The language of the above quoted provision of article 4 should be construed, if possible, so as to harmonize with this implication of the general grant of the taxing power, and yet be operative according to its true meaning and purpose. This may be accomplished by construing said provision to mean that those citizens only shall be qualified for assessment in any particular year who have first been ascertained, by an appropriate mode prescribed by the legislature, to be capable of paying a county tax for said year. In other words, it means that capacity to pay a county tax is the test of fitness to be assessed, and, as the framers of said provision manifestly designed, of the capacity essential to the proper exercise of the elective franchise. That this was the view of those who framed said provision of article 4 admits of no doubt, as will be found by recourse to the debates in the constitutional convention of 1831, which adopted it. In that convention, the proposition was made to abolish the prerequisite of paying a tax as a qualification for voting. In the course of the very able discussion of this question, conducted by the most eminent constitutional lawyers of the state, the principle upon which that prerequisite is based was very forcibly and plainly stated. In reference to this subject, Judge Hall said : " I do not regard the tax qualification as making an invidious distinction between the poor and the rich. If I did, I should vote against it. But I look upon the assessment of a tax as the

test of the capacity of a person to exercise the right of a voter. If a person has no property, you can, by our laws, tax his capacity. If he has neither property nor capacity to be taxed, he ought not to be suffered to dispose of your rights. The tax is the test of capacity. *   *   *   The principle of the constitution is this : You shall not vote unless you are taxed." Harker's Debates, Delaware Convention, 1831, p. 18. Similar views being expressed by Mr. Clayton and others, the principle was adopted by the convention, and imbedded in our present constitution. In view of this convincing testimony of the authors of our constitution, and of the additional reasons above stated, it does not seem reasonable to conclude that the said languarge of section 1, art. 4, can be recognized judicially as an implied inhibition of the enactment by the legislature of the said provisions of the acts of 1873, as regulations appropriate and essential to the effectual exercise of the taxing power.

The plaintiff's exclusion from assessment for the year 1886 as an unproductive taxable, pursuant to said enactments as such regulations, was in accord with the true meaning and purpose of the constitution that he, and all those who have been similarly ascertained to be unproductive taxables for a particular year, shall not be qualified for assessment for such year. Such citizens, in constitutional contemplation, are not permitted, under the said provision of article 4, to qualify as electors by the paying of a tax for such year, and hence cannot belong to the "voting class." For this reason, the said provisions of the acts of 1873 are not inhibited by the injunction of section 3 of article 1, that "all elections shall be free and equal." This injunction does not apply to those who have neither a right to vote, nor to qualify as electors, under the constitution of this state, which establishes, exclusively, the qualifications of those entitled to vote therein. In reality, however, said provisions, in their operation, are equal, and do not discriminate between any persons belonging to the same class of citizens who are in like condition, situation, or circumstances. The constitution itself, in

its intent, divides all citizens of the state into productive and un-
productive classes of taxables, for the purpose of assessment and
taxation, and empowers the legislature to select the productive, and
to reject the unproductive, class, as essential to the fulfillment of
this purpose. In accordance with this constitutional purpose, said
provisions were enacted. Consequently, if they authorize the as-
sessment of the productive, and forbid that of the unproductive
poll taxables, they are not prohibited, but authorized by the consti-
tution to do so. Also, if they do not operate similarly towards
property holders and non-property holders, it is not because of any
invidious discrimination between them created by said provisions.
It is because of the difference of condition and circumstances exist-
ing between them. All citizens, except minors and female citizens,
who own property, are subject to poll-tax, as well as non-property
holders. Again, said enactments do not exclude from assessment
as a punishment or forfeiture for crime, but to prevent a deficit.
Nor is their purpose to compel payment of his tax by disfranchis-
ing the delinquent taxable. It is to show that he is incapable of
paying a tax, and therefore unproductive as a taxable, and that the
assessment of him, and those in like condition, will produce a de-
ficiency of revenue.

The conclusion, therefore, seems unavoidable that the said pro-
visions of the acts of 1873, considered with reference to the case of
the plaintiff as presented by the record, are not unconstitutional
and void, but the contrary, and that it should be so certified to the
court below. The objections to their constitutional validity, with
the numerous authorities in support thereof, which were presented
by the counsel for the plaintiff so earnestly and so ably, have been
carefully examined, and deliberately considered, as was due to the
eminent counsel on both sides, and demanded by the gravity of the
subject. But they have failed to show that the opposition between
said provisions and the constitution is such that, as Chief Justice
Marshall observed in *Fletcher v. Peck*, 6 Cranch, 128, " the judge
feels a strong and clear conviction of their incompatibility with

each other." On the contrary, their enactment appears to have been clearly within the constitutional power of the legislature, as an appropriate and legitimate exercise of the taxing power. Being so, even though they may be unwise in policy, or defective and inefficient for the purpose designed in the enactment, the resort, for their annulment or amendment, must be, not to the courts, but to the representatives of the people, or, that failing, to the people themselves. The courts cannot annul these enactments, but they can and will enforce the penalties provided for their violation whenever any infraction thereof is properly presented and duly established.

SAULSBURY, Ch., and PAYNTER, J., concurred. HOUSTON, J., dissented. (Opinion not written.)